CASE NUMBER 14-7054

_____

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

_____

NICOLE ATTOCKNIE, personal representative of the
Estate of Aaron Scot Palmer, as mother and next friend of
M.P., a minor child, and individually,
Plaintiff/Appellee,

vs.

KENNETH CHERRY,
Defendant/Appellant,

_____

On Appeal from U.S.D.C. E.D. Okla. CIV-13-158-JHP
James H. Payne, United States District Judge

_____

DEFENDANT/APPELLANT, KENNETH CHERRY'S OPENING BRIEF

_____

ORAL ARGUMENT REQUESTED

_____

Dated: September 29, 2014

RICHARD N. MANN, OBA# 11040
Assistant Attorney General,
Litigation Unit
Office of the Oklahoma Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 521-3921
Facsimile: (405) 521-6146
richard.mann@oag.ok.gov
Attorney for Defendant/Appellant,
Kenneth Cherry

# TABLE OF CONTENTS

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF RELATED CASES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FILING DATES ESTABLISHING TIMELINESS OF APPEAL. . . . . . . . . . . . 1

ASSERTION OF APPELLATE JURISDICTION.. . . . . . . . . . . . . . . . . . . . . . 2

      Appealability.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.. . . . . . . . . . . . 3

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT: THE STANDARD OF REVIEW.. . . . . . . . . . . . . . . . . . . . . . 11

      A.     Qualified immunity for entry. . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.     Qualified immunity for use of force.. . . . . . . . . . . . . . . . . . . . 21

RELIEF SOUGHT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ORAL ARGUMENT STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF DIGITAL SUBMISSION. . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

## CASES

*Albright v. Rodriguez*,
51 F.3d 1531 (10th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Anderson v. Creighton*,
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed. 2d 523 (1987). . . . . . . . . . . . . . . . . 17, 20

*Ashcroft v. Al-Kidd*,
131 S.Ct. 2074 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Becker v. Bateman*,
709 F.3d 1019 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Behrens v. Pelletier*,
516 U.S. 299 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Blossom v. Yarbrough*,
429 F.3d 963 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Brosseau v. Haugen*,
543 U.S. 194 ; 125 S.Ct. 596 160 L.Ed. 2d 583 (2004). . . . . . . . . . . . . . . . . . . 21

*Corder v. Denver*,
229 F.3d 1162 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cordova v. Aragon*,
569 F.3d 1183. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Crawford-El v. Britton*,
118 S.Ct. 1584 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

*Cruz v. City of Laramie*,
239 F.3d 1183 (10th Cir. 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Devenpeck v. Alford*,
543 U.S. 146, 125 S.Ct. 533. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Estate of Larsen ex rel. Sturdivan v. Murr*,
511 F.3d 1255 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Felders v. Malcom*,
755 F.3d 870 (10th Cir. 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Garczynski v. Bradshaw,*
573 F.3d 1158 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Graham v. Conner*,
490 U.S. 386, 109 S.Ct. 1865 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Griffin v. Wisconsin*,
483 U.S. 868 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Groh v. Ramirez*,
540 U.S. 551 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Harris v. District of Columbia*,
932 F.2d 10 (D.C.Cir.1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hartman v. Moore*,
547 U.S. 250 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hunter v. Bryant*,
502 U.S. 224 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kerns v. Bader*
 663 F.3d 1173, 1180 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lewis v. Tripp*,
604 F.3d 1221 (10th Cir.2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Malley v. Briggs,*
475 U.S. 335, 106 S.Ct. 1092(1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 21

*Mascorro v. Billings,*
656 F.3d 1198 (10th Circuit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Medina v. Cram,*
252 F.3d 1124 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Messerschmidt v. Millender,*
132 S.Ct. 1235 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Mincey v. Arizona,*
437 U.S. 385, 98 S.Ct. 2408 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mitchell v. Forsyth,*
472 U.S. 511 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

*Oliver v. Woods,*
209 F.3d 1179 (10th Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ornelas v. U.S.,*
517 U.S. 690 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Pahls v. Thomas,*
718 F.3d 1210 (10th Cir.2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pearson v. Callahan,*
555 U.S. 223, 129 S.Ct. 808 (2009). . . . . . . . . . . . . . . . . . . . . . 16, 18,19, 20

*People v. Morales,*
198 A.D. 2d 129, 603 N.Y. S. 2d 319 (N.Y. App. Div. 1993). . . . . . . . . . . . . 25

*Pierce v. Gilchrist,*
359 F.3d 1279, (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reichie v. Howards,*
132 S.Ct. 2088 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rojas v. Anderson*,
No. 12-1283, 2013 WL 3389450 (10th Cir. July 9, 2013). . . . . . . . . . . . . . . 13, 23

*Saucier v. Katz*,
533 U. S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 23

*Scott v. Harris*,
550 U.S. 372 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 11

*Stanton v. Simms*,
134 S.Ct. 3, 187 L.Ed. 2d 341(Nov. 4, 2013). . . . . . . . . . . . . . . . . . . . . . . passim

*Tennessee v. Garner*,
471 U.S. 1, 105 S.Ct. 1694(1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tolan v. Cotton*,
572 U.S. ____. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*U.S. v. Gonzalez,*
763 F.2d 1127 (10th Cir. 1985. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Santana*,
427 U.S. 38, 96 S.Ct. 2406 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Warden v. Hayden*,
387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782. . . . . . . . . . . . . . . . . . . . . . . . 15

*Wilson v. Lane*,
526 U.S. 603 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

## STATUTES

28 USC § 1331.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 USC § 1367.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 USC § 1983.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 16

## RULES

Fed. R. App. P. 25(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. App. P. 32(a)(7)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. App. P. 4(A)(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 34(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## STATEMENT OF RELATED CASES

*Attocknie v. Cherry*, et al., Case No. 14-7053 (appeal of same District Court Order by Defendant Sheriff Shannon Smith; copy attached hereto**)**.

## JURISDICTIONAL STATEMENT

Plaintiff Attocknie initially brought this action in the Eastern District for the State of Oklahoma against Defendant Smith (Smith) in his official and individual capacity as the Sheriff of Seminole County, and against individual Defendant Cherry and Tammy Wall, in her individual and official capacity as Administrator of Seminole County Special Programs, ("Drug Court"), alleging violations of the U.S. Constitution pursuant to 42 USC § 1983, and pendent Oklahoma tort and constitutional claims. The District Court properly exercised its original jurisdiction over the federal claims and supplemental jurisdiction over the pendent state claims pursuant to 28 USC § 1331 and 28 USC § 1367.

## FILING DATES ESTABLISHING TIMELINESS OF APPEAL

On July 11, 2014, the district court entered an opinion and order denying Defendant Cherry's motion for summary judgment on the issue of qualified immunity. (7/11/14 Order of Court, Dkt. 168) Defendant Cherry filed his notice of appeal on July 16, 2014. (7/16/14 Notice of appeal of Cherry, Dkt. 178) Accordingly, this appeal is timely pursuant to Fed. R. App. P. 4(A)(1)(a).

## ASSERTION OF APPELLATE JURISDICTION

Although a District Court's denial of summary judgment is not generally appealable, an exception is made where a defendant has asserted qualified immunity and the issue is appealed as a matter of law. *Blossom v. Yarbrough*, 429 F.3d 963, 966 (10th Cir. 2005) An order denying qualified immunity is immediately appealable to the extent the argument involves a question of law. E.g, *Cruz v. City of Laramie*, 239 F.3d 1183, 1187-89 (10th Cir. 2001) The Court has plenary jurisdiction over this appeal, because orders denying qualified immunity are immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Scott v. Harris*, 550 U.S. 372 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Behrens v. Pelletier*, 516 U.S. 299 (1996); *Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012); *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074 (2011); *Hartman v. Moore*, 547 U.S. 250 (2006); *Behrens v. Pelletier*, 516 U.S. 299 (1996); *Hunter v. Bryant*, 502 U.S. 224 (1991); *Pahls v. Thomas*, 718 F.3d 1210 (10th Cir.2013); *Lewis v. Tripp*, 604 F.3d 1221 (10th Cir.2010); *Albright v. Rodriguez*, 51 F.3d 1531 (10th Cir.1995). Although interlocutory appellate jurisdiction is limited to review of the District Court's order, only to the extent that it "turns on issue of law." *Mitchell*, 472 U.S. at 530.

**Appealability:** "if the district court commits legal error en route to a factual determination, that determination is thereby deprived of any special solicitude it might otherwise be owed on appeal." *Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th

Cir. 2013). The job of the Appellate Court is to "consider the legal question whether the facts that a reasonable jury could find suffice to show a constitutional violation." *Id.* In addition, where the "version of events" the District Court holds a reasonable jury could find "is blatantly contradicted by the record," the Appellate Court may assess the case based on its own *de novo* review of what facts a reasonable jury could accept as true. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Accordingly, where the District Court in this instance states that there is a question of fact as to the "hot pursuit" it bases that assumption on factual question that is blatantly contradicted by the record. It does not ultimately matter whether Cherry actually sees Randell Palmer running into the house, but rather, only that it is reasonable for him to believe that it is Randell Palmer running into the house. As will be demonstrated hereinafter, it is remarkably unlikely that such a reasonable belief can be controverted based upon the facts in the record. See: *Felders v. Malcom*, 755 F.3d 870, 878, fn. 2 (10th Cir. 2014) ("…(2) the 'version of the events' the district court found a reasonable jury could believe is 'blatantly contradicted by the record…")

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The District Court erred in denying Cherry qualified immunity, because as construed by the Court, there was a fact question in regards to his "hot pursuit" which was the basis for his warrantless entry into the subject house. Secondly, the

court incorrectly failed to address qualified immunity on behalf of Cherry on the use of force issue.

Plaintiff is suing Defendant Cherry in his individual capacity for violation of the Fourth Amendment via 42 U.S.C. § 1983, the Oklahoma State Constitution for identical claims, and state tort claims of assault and battery and possibly negligence although it is difficult to ferret out that particular cause.

This case arises from the attempted arrest by warrant of fugitive Randell Palmer, and the unfortunate, but justifiable, shooting of his son, Aaron Palmer, by Officer Cherry in pursuit of Randell Palmer on August 25, 2012. Cherry contends that he was within the scope and course of his employment as the Seminole County Drug Court Compliance Officer at the time of the subject events and was lawfully in pursuit of Randell Palmer ("Randell") when upon entering the residence where Randell was believed to be located he encountered Aaron Palmer ("Aaron") with a large butcher knife. The record in this case provides that Cherry believed he had spotted Randell running into the residence of Aaron Palmer and engaged in the "hot pursuit" of Randell. Cherry moved for summary judgment based upon qualified immunity for the entry without a search warrant and also for the use of force in defending himself from Aaron upon entry. The District Court denied qualified immunity finding a question of fact as to whether Cherry's warrantless

entry was reasonably based on hot pursuit. The Court did not reach a determination on qualified immunity on the use of force, instead summarily failing to consider that aspect of the case by concluding that once in the house Aaron's rights had already been violated. ("Cherry spends a great deal of time arguing that where an officer reasonably believes his life is in danger, he is entitled to use deadly force. While that may be true, if Cherry had no exigent circumstances to justify entry into the residence, he had already violated Aaron Palmer's Fourth Amendment right prior to the shooting.") Accordingly, if Cherry is legally in the house, then this Court must conduct a de novo review of the use of force to determine if he is entitled to qualified immunity.

## STATEMENT OF THE FACTS

Cherry was attempting to serve a warrant for the arrest of Randell Palmer on August 25th, 2012. (Appellant's Appendix (Aplt. Appx.) at 32, Plaintiff's Second Amended Complaint, at ¶¶. 21 and 22); and Aplt. Appx. at 198-99, Bench Warrant for arrest of Randell Palmer). It is undisputed that Cherry, upon entering the residence of Aaron Palmer and Nicole Attocknie, was met near the doorway entrance by Aaron Palmer who had a large knife in his hand. (Aplt. Appx. at 5; Plaintiff's Second Amended Complaint, at ¶. 35; (Aplt. Appx. at 119, Deposition of Cherry) Prior to attempting to serve the warrant for Randell Palmer, Cherry had seen him standing in the garage of the Killingsworth address. (Aplt. Appx. at 105,

Cherry).

Randell had been at the Killingsworth address earlier in the day. (Aplt. Appx. at 138 -150, and 154, 155; Deposition of Damien Ruiz). Randell Palmer had choked by the neck, and thrown sixteen year old Damien Ruiz earlier in the same day at that residence after Ruiz laughed at him for tripping over a chair in the garage. Ruiz lived at the house with Aaron Palmer and Nicole Attocknie. (Aplt. Appx. at 138- 143).

After seeing Randell Palmer standing in the garage, but prior to attempting to take him into custody, Cherry called Seminole Police Department to enlist other law enforcement officers to aid him in serving the warrant. (Aplt. Appx. at 105-06, Cherry). After making a tactical plan, Seminole officers accompanied him back to the Killinsworth residence. (Aplt. Appx. at 107-111, Cherry). As Cherry arrives at the location, he sees an individual who he believes to be Randell, run through the garage and into the house. (Aplt. Appx. at 110 and 119). Upon arrival, and as other officers took up position around the residence, Cherry exited his vehicle in pursuit of Randell Palmer and proceeds to the open, "ajar" entry door. (Aplt. Appx. at 113, 120 - 124; 126). Cherry was announcing himself as he approached the house and during entry. Upon approaching the front door, Cherry has to go around a large pit bull chained and barking in front of the house. (Aplt. Appx. at 110, 114, 119).

Cherry had been warned by individuals that Randell Palmer was dangerous and possibly armed. (Aplt. Appx. at 125). Upon entry Cherry is confronted immediately by Aaron holding the knife in an upraised position which Cherry perceived as aggressive and an immediate threat. (Aplt. Appx. at 119, 126-128, and 132-133). Cherry estimated that the distance between him and Aaron Palmer was four (4) feet or less from him when he opened fire, and was moving towards him. (Aplt. Appx. at 134-135). He opens fire with one round hitting Aaron Palmer in the chest. He died later that evening at a local hospital.

Both Aaron Palmer and Nicole Attocknie were aware that Randell Palmer had a warrant out for his arrest. (Aplt. Appx. at 158 -160; Deposition of Nicole Attocknie). Both Aaron Palmer and Nicole Attocknie knew that law enforcement officers had searched the Killingsworth address previously looking for Randell while they were living there. (Aplt. Appx. at 160 - 169, Attocknie). Cherry believed that Randell resided at the Killingsworth address because he had been told that by Drug Court employees including Tammy Wall, and the previous Drug Court Compliance Officer, Joe Glasco. (Aplt. Appx. at 112 and 115 - 119). Randell Palmer was wanted for arrest for his failure to comply with drug court requirements as part of his probation. (Aplt. Appx. at 66, Plaintiff's Second Amended Complaint). Fellow drug court participant, Brittany Maxwell, and friend of Randell Palmer, signed a waiver to her right to be free from searches when she

entered into Seminole County Drug Court as one of the conditions. She testifies that she understands that this waiver was effective to any residence you are in, whether it's yours or not. (Aplt. Appx. at 192 -194, deposition of Brittany Maxwell). As part of his probation via drug court, Randell has waived his Fourth Amendment rights to search. (Aplt. Appx. at 201 -206, Seminole County Drug Court Performance Contract, ¶ 34; and 208 -210, Seminole County Drug Court Program, Notice of Responsibilities and Rights, ¶ 8).

Randal Palmer posed such an unpleasant and unwanted aspect of their lives, that Aaron Palmer and Nicole Attocknie were packing and planning on moving to an undisclosed location to get away from Randell. Nicole Attocknie was concerned that Randell had a warrant for his arrest, and yet finds out from Aaron that he was coming to her house while she was at work and taking showers, eating food and taking toiletry items from the house. (Aplt. Appx. at 166 – 173, and 174 – 175, Attocknie). Nicole Attocknie was aware that Aaron feared his father, Randell, because he had physically abused him and specifically beat him while in a car at a casino in 2011. Nicole Attocknie and Aaron are scared of Randell and are packing to move the day after the shooting. (Aplt. Appx. at 176 - 186, Attocknie). Nicole Attocknie commented to the EMT Potterfield who treated Aaron, that "they were going to move away from all this" at the hospital following Aaron's shooting. In fact, Nicole Attocknie told Potterfield that she had personally called the [Seminole]

drug court and 'the cops' to come out and get "him" although she did not specify

who she meant. (Aplt. Appx. at 189, Deposition of Jimmy Poterfield, EMT).

Cherry had use of force and tactical training previously in his career as a

corrections officer. (Aplt. Appx. at 129 – 131, Cherry; and Aplt. Appx. at 212 -

217, Training record of Cherry from Corrections Corporation of America). Cherry

also had on duty training as a reserve officer with the City of Wewoka, Oklahoma,

in the service of warrants. (Aplt. Appx. at 114 - 115, Cherry).

The subject shooting was reviewed and analyzed by O.R. Barris, District

Attorney for the subject district with the conclusion that the shooting was a

justifiable homicide in that he "…was engaged in the performance of the execution

of legal process and that the circumstances of that activity created a circumstance

wherein Deputy Cherry could have had a reasonable belief that the use of force

applied by him was necessary to protect himself and/or other officers from serious

bodily harm." (Aplt. Appx. at 196 – 197, Letter dated November 7[th], 2012 from

O.R. Barris, District Attorney to Attorney General Scott Pruitt).

## SUMMARY OF THE ARGUMENT

Cherry is entitled to qualified immunity as he was in hot pursuit of a

convicted felon when he entered the subject residence and shot Aaron in self-

defense. Indeed, the question of the existence of "exigent circumstances" giving

Cherry reason to give chase is based upon the objective facts as reasonably

articulated by Cherry, and are not dependent upon the actual presence of Randall Palmer at the time of pursuit. In other words, as long as Cherry believes he sees Randall Palmer, a wanted felon, running into the garage, Cherry's "hot pursuit" is reasonable and satisfies the Fourth Amendment, as an accepted exception to entry with a warrant.

The only facts relevant to the Court's consideration are those known to Cherry at the time he engages in his pursuit. It is the facts known to the officer at the time and no other considerations as to his state of mind are relevant. *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 533. As long as Cherry sees someone going into the house through the garage, it does not matter whether it actually is Randall Palmer or someone Cherry believes to be him. Accordingly, articulating a fact question of the actual presence of Randall Palmer at the time of the initiated pursuit is misplaced. It is undisputed from the record that Randall Palmer was actually in the area of his house, mere minutes prior to the pursuit, as he admitted to being present when Cherry initially viewed him from another street. (Aplt. Appx. at 694 – 699, Deposition of Randell Palmer).

The job of the Appellate Court is to "consider the legal question whether the facts that a reasonable jury could find suffice to show a constitutional violation." *Id.* In addition, where the "version of events" the District Court holds a reasonable jury could find "is blatantly contradicted by the record," the Appellate Court may

assess the case based on its own *de novo* review of what facts a reasonable jury could accept as true. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Supreme Court has never recognized a limitation of interlocutory jurisdiction from an order denying qualified immunity, where the issues involved whether or not probable cause or reasonable suspicion exist. This may be because probable cause and reasonable suspicion are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." Thus, the issue of whether probable cause or reasonable suspicion is present is always reviewed *de novo*. *See Ornelas v. U.S.*, 517 U.S. 690 (1996) (holding that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal."). Finally, when the District Court, at summary judgment, fails to identify the particular charged conduct that it deemed adequately supported by the record, the Appellate Court may "look behind the order denying summary judgment and review the entire record *de novo* to determine for itself, as a matter of law, which factual inferences a reasonable jury could and could not make. *Lewis v. Tripp*, 604 F.3d at 1225.

## ARGUMENT:  THE STANDARD OF REVIEW

The denial of summary judgment on the grounds of qualified immunity is reviewed *de novo*. *Oliver v. Woods*, 209 F.3d 1179, 1184 (10th Cir.2000). Because probable cause and reasonable suspicion are "fluid concepts that take their

substantive content from the particular contexts in which the standards are being assessed", the issue  of whether probable cause or reasonable suspicion is present is always reviewed *de novo*. *See Ornelas v. U.S.*, 517 U.S. 690 (1996) (holding that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal").

On interlocutory review of a denial of summary judgment, the appellate court applies the same summary judgment standard as the district court. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2011) ("[a]pplying the same standards as the district court, we must determine whether the plaintiff has satisfied a 'heavy two-part burden.'"). However, because qualified immunity is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial, the appellate court reviews summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings. *Rojas v. Anderson*, No. 12-1283, 2013 WL 3389450 (10th Cir. July 9, 2013). When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test: first, the plaintiff must show that the defendant's actions violated a constitutional or statutory right; second, the plaintiff must show that this right was clearly established at the time of the conduct at issue. *Id.* If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there

are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *Id.*

Qualified immunity acts as a defense not only from liability, but suit itself, when officers act reasonably and consistent with the constitution and civil rights even though an injury is sustained by someone. Also, it is clear that the defense of qualified immunity applies to all <u>federal</u> law claims. *Crawford-El v. Britton*, 118 S.Ct. 1584 (1988).

### A.   <u>Qualified immunity for entry</u>:

In a remarkably similar, and recent, United States Supreme Court opinion, the court upheld a district court's ruling in favor of an officer on qualified immunity for his pursuit of a suspect where a bystander was injured by the officer. In *Stanton v. Simms*, 134 S.Ct. 3, 187 L.Ed. 2d 341(Nov. 4, 2013) the Court reversed the Ninth Circuit Court of Appeals and reinstated the District Court's decision in favor of the pursuing officer finding that the law was not clearly established that a *warrantless* entry to a home while in hot pursuit on a misdemeanor was a Fourth Amendment violation. There the officer was in pursuit of an individual suspected of committing a misdemeanor. When the officer kicked open a fence gate in pursuit, he struck the eventual plaintiff, Simms, hitting her in the head and injuring her shoulder. The Court provided that,

[q]ualified immunity gives government officials breathing room to

make reasonable but mistaken judgments and protects 'all but the plainly incompetent or those who knowingly violate the law. *Ashcroft v. al-Kidd*, 563 U.S.-----, 131 S.Ct. 2074, 2085(2011)(quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092(1986) [w]e do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' *al-Kidd*, 563 U.S. at-------, 131 S.Ct., at 2083

Noting a sharp split among federal circuits and other authorities on officers' entry into homes on a warrantless arrest while in hot pursuit, the Court determined that the pursuing officer was "not plainly incompetent" so as to be protected by qualified immunity, regardless of what the Ninth Circuit thought. At p. 5. (cf: *Mascorro v. Billings*, 656 F.3d 1198, 1207 (10th Circuit) finding warrantless pursuit into home for arrest for a traffic misdemeanor not justified…) (See also: *Griffin v. Wisconsin*, 483 U.S. 868 (1987), relaxing warrant and probable cause requirements for those on probation, such as Randell Palmer).

This situation is also similar to the facts of *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406 (1976). In *Santana*, the police observed a suspect standing in the doorway of her home. Upon attempting to take her into custody, the suspect ran back into her house. The officers pursued and placed her under arrest. The Court said:

"…Santana, while standing in the doorway of her house, was in a 'public place' for purposes of the Fourth Amendment, since she was not in an area where she had any expectation of privacy…[t]hus, when the police, who concededly had probable cause to do so, sought to

-14-

arrest her, they merely intended to make a warrantless arrest in a public place upon probable cause and did not violate the Fourth Amendment…. By retreating into a private place, Santana could not defeat an otherwise proper arrest that had been set in motion in a public place. Since there was a need to act quickly to prevent destruction of evidence, there was a true 'hot pursuit,' which need not be extended  hue and cry 'in and about the public streets,' and thus a warrantless entry to make the arrest was justified…" citing *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (other internal citations omitted)

To arrive at the "fact question" scenario, promulgated by the District Court and pursued by the Appellee, the Court would have to determine that an individual officer's articulated reason for hot pursuit and home entry can never stand alone. It should be sufficient to justify a finding of qualified immunity and appeal should not be dismissed.

It is beyond question, that an actual hot pursuit amounts to an exigent circumstance allowing entry into a house without a warrant. *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408 (1978). "The term 'exigent circumstances' generally refers to the following circumstances: 'imminent danger of death or serious bodily harm, imminent danger of destruction of important property, response to an emergency, *or hot pursuit of a fleeing felon*." *United States v. Gonzalez,* 763 F.2d 1127, 1132 n.5 (10th Cir. 1985) (emphasis added). In the present matter, it is undisputed that Cherry had a bench warrant for the arrest of Randall Palmer.

Cherry cited *Stanton v. Simms*, U.S. 134 S.Ct. 3, 187 (2013) as authority for hot pursuit of a suspect where an individual, other than the suspect, is injured. There, the Court found that officer to be entitled to qualified immunity, as the law was not clearly established on pursuit for a misdemeanor and also that the officer was not plainly incompetent. Other than the fact that Cherry had a warrant for the arrest of Randall Palmer, the *Simms* case is directly on point. There, the officer articulated that he believed he was pursuing a fleeing misdemeanant when he entered the gate at the residence. Here, Cherry has articulated a good faith belief that he was in pursuit of Randall Palmer, and cannot be determined to be "plainly incompetent" under any reasonable interpretation of the facts. Again, qualified immunity protects those officers even if their actions are based upon mistake or facts. *Stanton* at 5 citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 and *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808 (2009).

Qualified immunity is the presumption in § 1983 cases. In recent years, the Supreme Court has clarified what must be established for a Plaintiff to overcome the assertion of qualified immunity. The Plaintiff must establish (1) that there, in fact, was a constitutional violation and (2) that the law was clearly established so as to put the state official on notice that her actions constituted a constitutional violation *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011). This is an extremely high bar for the Plaintiff. *Id*. The Plaintiff must establish that a

constitutional violation occurred and then must also establish that the constitutional rule under which the plaintiff is complaining was so clearly established that it is beyond debate *Id*.; *Ashcroft v. al–Kidd*, 563 U.S. ——, 131 S.Ct. 2074, 2080, 2083, 179 L.Ed.2d 1149 (2011).  If people can disagree on a constitutional rule or on its application to a particular set of facts, then it is not beyond all debate and qualified immunity must remain intact.  *Id*; *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  See also: *Cordova v. Aragon*, 569 F.3d 1183, 1189-93 (if it is not an "easy" question, then qualified immunity attaches).  One way to establish that a constitutional rule is clearly established is to point to a Supreme Court case on point or on such a wealth of case law from circuit courts that no reasonable state official could debate the existence of the constitutional rule and its application to a set of facts. *Reichie v. Howards*, 132 S.Ct. 2088, 2093 (2012).  However, one Supreme Court case which can be distinguished from the case under consideration, or points of law over which circuits are split, do not create clearly established law. *Id*. (finding that two decisions from the Tenth Circuit did not create "clearly established" law, particularly since one decision rested on an abrogated case).  See also: *Stanton v. Simms* 134 S.Ct. 3, 4-7 (2013).

In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed. 2d 523 (1987), the Court stressed that caution must be used to avoid establishing a rule of law at a level of broad generality.  The Court stated that the right alleged to have

been violated must have been clearly established in a more "particularized, and hence more relevant, sense." 107 S.Ct. at 3039. In explaining this more "particularized sense," the Court said

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…in light of preexisting law, the unlawfulness must be apparent….

In the *Pierce v. Gilchrist*, 359 F.3d 1279, (2004) case, the Tenth Circuit relied upon the two step inquiry from *Saucier v. Katz*, 533 U. S. 194 (2001). However, the Supreme Court entered a decision on January 21, 2009, in the case of *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565(2009)(Slip opinion, 07-751), which gave much greater flexibility to the Court in analyzing qualified immunity defenses than provided in *Saucier, Id.*

In the *Pearson* case, the Court acknowledged the inflexibility of the two step process *Saucier, i.e.*, (1) has the plaintiff presented sufficient facts to make out a violation of the constitution; and (2) was the unconstitutionality of the officers' conduct clearly established. The Court specifically requested the parties to address whether the mandatory procedures from *Saucier* should be maintained, or even overruled. At 815.

The Court noted that [t]he protection of qualified immunity applies

regardless of whether the government official's error is "a mistake of law, a mistake of fact, or mistake based on mixed questions of law and fact." *citing Groh v. Ramirez*, 540 U.S. 551, 567 (2004). The Court essentially concluded that "rigid adherence" to the *Saucier* rule is confusing, causes problems and creates difficulties in review of unclear constitutional concepts. The Court said that judges should "be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand..." (at p. 818)

A review of the *Pearson* case facts help to understand the defense. Members of a Utah narcotics task force searched an individual's house for illegal drugs without a warrant or consent. Their only arguable "consent" was that given to a drug purchasing informant who entered the house with permission of the owner. The officers searched the house upon a signal from the informant and found drugs and paraphernalia. The federal district court in Utah, where the case arose, granted the officers qualified immunity. However, the Tenth Circuit reversed on the basis that a warrantless and non-consensual search was per se unreasonable pursuant to the Fourth Amendment.

On cert, the U.S. Supreme Court reversed, finding that the officers were in fact entitled to qualified immunity based on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the

time…" citing *Wilson v. Lane*, 526 U.S. 603, 614 (1999).  The Court relied upon a "consent once removed" doctrine that was followed at that time in lower federal courts.

The court found that "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson et al. v. Callahan*, 129 S.Ct. 808 (2009).  "[I]f judges ... disagree on a constitutional question, it is unfair to subject [state officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U. S. 603, 618 (1999).

Whether a statutory or constitutional right was clearly established at the time of the official's conduct is "an 'essentially legal question.'" *Crawford–El v. Britton*, 523 U.S. 574, 588 (1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526–29 (1985). It is not enough simply to allege the violation of a clearly established but conceptually broad right, such as the right to free speech, or the right to substantive due process.  See *Ashcroft v. al-Kidd*, id., ("We have repeatedly told courts ... not to define clearly established law at a high level of generality.") (citations omitted).  Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at

640; see *al- Kidd*, ——— U.S. ———, 131 S.Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). "Reasonable knowledge of the law means ... knowledge of present constitutional law [and] involves knowledge only of legal rules that were 'clearly established' at the time of the conduct at issue." *Harris v. District of Columbia*, 932 F.2d 10, 13 (D.C.Cir.1991) (citation omitted). Thus, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.' "*al- Kidd*, 131 S.Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**B.     Qualified immunity for use of force:**

In the context of excessive force cases, the U.S. Supreme Court has acknowledged that such cases fall into a "...hazy border between excessive force and acceptable force..." *Brosseau v. Haugen*, 543 U.S. 194, at 201; 125 S.Ct. 596 160 L.Ed. 2d 583 (2004).   In Brosseau, an officer shot and severly wounded a burglary suspect with an outstanding warrant, in the process of attempting to elude the officer.   Unlike the present case, where Aaron Palmer was armed with a knife in the immediate proximity of Defendant Cherry, Plaintiff Haugen was unarmed and merely attempting to flee.   Nevertheless, the Court found the officer entitiled to qualified immunity for using deadly force where he believed the suspect posed a threat to others.   In the present case, Palmer posed a legitimate threat to Officer

Cherry.  (See also:  *Garczynski v. Bradshaw,* 573 F.3d 1158 (11th Cir. 2009) determing that officers need only *arguable* probable cause, at 1167)

In *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694(1985) and *Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865 (1989), the Supreme Court determined that excessive force cases are judged by the objective, reasonableness standard of the Fourth Amendment.  Where an officer reasonably believes that an individual poses a threat he is allowed to use deadly force.  Here, Cherry is met at the door that he believes he is entitled to enter and is met by an individual with an upraised 10-12 inch knife.  Following the "beyond debate" conclusion compelled by *al-Kidd*, *Id*., qualified immunity attaches and the claims against Cherry should be denied.

For other instances of qualified immunity in regards to use of force claims, see *Becker v. Bateman*, 709 F.3d 1019 (10th Cir. 2013), where the Circuit court provided that the law was *not* clearly established in regards to the "appropriate level" of force which may be used in arresting a drunk driver, who sustained a traumatic brain injury in the police assisted takedown; and *Corder v. Denver*, 229 F.3d 1162 (10th Cir. 2000) (unpublished), where qualified immunity was denied when officers removed an intoxicated individual from his vehicle and unfortunately placed him directly onto an extremely hot manhole cover. When, kicking and screaming, he complained that "…he was on fire…" he was maced in the face by an officer.

Lastly, it is important to note that once a defendant has properly raised qualified immunity, the burden shifts to the Plaintiff to satisfy the strict two part test of *Saucier*, *Id.*: first that the defendant's actions violated a constitutional right and, secondly, that the right was clearly established at the time of the conduct. *Rojas v. Anderson,* 727 F.3d 1000 (10th Cir. 2013), at 1003, *cert denied*, 134 S.Ct. 800, 187 L.Ed2d 596 (Dec. 9, 2013). Then and only then, does the traditional burden go back upon the Defendant/movant to show that there is no genuine issue as to any material fact. *Id*. Although it is still clear that all disputed facts must be taken in the light most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. _____, (May 5th, 2014).

Plaintiff also speculates that Cherry saw "Randell Palmer or someone fitting his description in the garage…," and that "…Randell denies ever being in the house on August 25, 2012…." Interestingly, Randell Palmer himself confirmed in his deposition his presence at or about the house at the time that Cherry indicates he saw him on his detour while looking for him. (Aplt. Appx. at 694 – 699, Palmer deposition). Of course Randell denies being in the garage, or the house all day. This comment has been refuted not only by Cherry, but by 16 years old Damien Ruiz who shared the house with Nicole Attocknie and Aaron Palmer. Ruiz testified that earlier that day, Randell, had grabbed him by the neck and flung him into the yard for the offense of laughing at him for tripping over a chair in the garage.

Instead of taking issue with the testimony of Randell Palmer, whom Plaintiff has testified that she was trying to move away from, Plaintiff and her counsel took the ironic position of relying upon him. Randell, an undisputed meth abuser for at least twenty five years, not surprisingly denies ever being in the house on the 25th of August. Palmer does testify that he was at the location that day when Cherry sees him and in fact ran and hid in the woods because in his words, "…oh shit, they're going to get me now…." (Aplt. Appx. at 698, Palmer deposition). Even Plaintiff agrees that Cherry went to get other officers to back him up, which is considerably more thoughtful than the premeditated shooting now suggested by Plaintiff. In fact, Randell Palmer has eluded the police before from the house across the street owned by Ken Dawson. As well, he had eluded police from another house. (Aplt. Appx. at 682 – 687; 688 – 693; 694 - 699 and 700 - 702).

From the record in this case to date, it is clear that Randell Palmer had a penchant for staying one step ahead of the law and running from them on many occasions. If one "…reasonable inference…," can be drawn, from this case, it is that Cherry acted thoughtfully and reasonably in identifying Randell Palmer at the Killingsworth address, getting backup, and attempting to take him into custody while in hot pursuit at a location where even Randell Palmer confirms his presence. Again, it is unfortunate, but undenied even by Plaintiff, that Aaron Palmer met Cherry just inside his door way with a large knife in his hand. Under concepts on

constitutional law and qualified immunity, if the officers' actions in use of force were objectively reasonable, qualified immunity attaches. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008). While the courts can view a variety of factors, it should avoid making use of "…20/20 vision of hindsight…" at 1259, and instead should judge the use of force based on the officers "…on-scene perspective…" at 1260. Accordingly, even where possibly mistaken, i.e., another use of the knife to cut cheeseburgers, (which was not conceded by Cherry), if that were unknown to the officer in hot pursuit, then the officers belief of the threat of immediate serious bodily harm justifies the use of force. "A reasonable officer need not await the 'glint of steel' before taking self-protective action, by then it is 'often too late to take safety precautions…'" at 1260, citing *People v. Morales*, 198 A.D. 2d 129, 603 N.Y. S. 2d 319 (N.Y. App. Div. 1993).

The District Court simply inferred a question of fact where none necessarily existed. Here, as in the *Stanton* case, Cherry has articulated that he saw Randell run into the home thus creating the hot pursuit situation. There is no requirement that his belief must be confirmed by other witnesses, much less by the felon Randell Palmer. The Court's reliance on the thoroughly disreputable Randell Palmer as the means to create a question is unwarranted as his testimony is not subject to reasonable belief by a jury.

## RELIEF SOUGHT

Appellant/Defendant Kenneth Cherry respectfully requests that the District Court's denial of summary judgment be reversed with directions for the Court to enter judgment in his favor.

## ORAL ARGUMENT STATEMENT

Appellant/Defendant Kenneth Cherry respectfully requests oral argument to assist the Court's complete understanding of the issues in this case pursuant to Fed.R.App.P. 34(a) and 10th Cir. R. 34.1.

Respectfully submitted,

/s/ Richard N. Mann
RICHARD N. MANN, OBA# 11040
WILSON D. McGARRY, OBA# 31146
Assistant Attorneys General, Litigation Unit
Office of the Oklahoma Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 522-2921
Facsimile: (405) 521-4518
richard.mann@oag.ok.gov
wilson.mcgarry@oag.ok.gov
*Attorney for Defendant/Appellant,*
*Kenneth Cherry*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 6842 words.

I relied on my word processor to obtain the count and it is WordPerfect X6.

I counted five characters per word, counting all characters including citations and numerals.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to the Tenth Circuit Court of Appeals' General Order on Electronic Submission of Documents (March 18, 2009), I hereby certify that:

1. There are no required privacy redactions (Fed. R. App. P. 25(a)(5)) to be made to the attached ECF pleadings;

2. This ECF submission is an exact copy of the additional hard copies of Defendant/Appellant, Kenneth Cherry's Opening Brief; and

3. This ECF submission was scanned for viruses with Sophos Endpoint Security and Control, version 9.7, a commercial virus scanning program that is updated hourly, and, according to the program is free of viruses.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 29th day of September, 2014, a true and correct copy of the above and foregoing, was electronically transmitted to the Clerk of Court using the ECF System for filing; and transmitted the original and seven copies of the above and foregoing to the Clerk of the Court via United States Postal Service, postage fully prepaid thereon, and further mailed a copy of the above and foregoing via United States Postal Service, to the following interested parties, who may not be a registered participant of the ECF System:

Mr. Jack Mattingly, Sr., Esquire
Mr. Jack Mattingly, Jr., Esquire
THE MATTINGLY LAW FIRM, P.C.
215 East Oak
Seminole, Oklahoma 74818
jacksr@mroklaw.com
jackjr@mroklaw.com

*Attorney for Plaintiff/Appellee,*
*Nicole Attocknie*

Mr. Jason E. Roselius, Esquire
Mr. Tanner W. Hicks, Esquire
Mattingly & Roselius, P.L.L.C.
13190 North MacArthur Boulevard
Oklahoma City, Oklahoma 73142
jason@mroklaw.com
tanner@mroklaw.com

*Attorneys for Plaintiff/Appellee,*
*Nicole Attocknie*

Mr. Chris J. Collins, Esquire
Mr. Philip W. Anderson, Esquire
Mr. Jordan L. Miller, Esquire
COLLINS, ZORN & WAGNER, P.C.
429 Northeast 50th Street, Second Floor
Oklahoma City, Oklahoma 73105
cjc@czwglaw.com
panderson@czwglaw.com

*Attorneys for Defendant,*
*Shannon Smith*

Mr. M. Daniel Weitman
Assistant Attorney General, Litigation Unit
OFFICE OF THE OKLAHOMA ATTORNEY GENERAL
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
dan.weitman@oag.ok.gov

*Attorney for Tammy Wall*

Mr. Lawrence R. Murphy, Jr., Esq.
Robinett & Murphy & Shrier
624 South Boston Avenue, Suite 900
Tulsa, Oklahoma 74119


/s/ Richard N. Mann
RICHARD N. MANN

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| NICOLE ATTOCKNIE, as personal representative of Estate of Aaron Scott Palmer, *et al.*, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-13-158-JHP |
| | ) | |
| SHANNON SMITH, Sheriff of Seminole County, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter comes before the Court on the Motions for Summary Judgment by Defendant Cherry (Dkt. No. 107), Defendant Smith (Dkt. No. 108), and Defendant Wall (Dkt. No. 110). On June 2, 2014, Plaintiff filed responses to said motions (Dkt. Nos. 124, 126, and 125, respectively). On June 16, 2014, Defendants filed their replies (Dkt. Nos. 150, 152, and 151, respectively). Also pending before the Court is Defendant Wall's Motion to Dismiss (Dkt. No. 94). Plaintiff filed their response on April 24, 2014 (Dkt. No. 101) and Wall replied on May 1, 2014 (Dkt. No. 104).

## STATEMENT OF UNDISPUTED FACTS

On July 23, 2012, Sheriff Shannon Smith ("Sheriff") appointed Defendant Kenneth Cherry ("Cherry") as a deputy. *See*, Dkt. Nos. 110-4 and 125-2, at p. 11, Notification of Employment; Dkt. No. 107-7, at p. 2, Letter from District Attorney of Okmulgee County (indicating at time of shooting Cherry was an employee of the Seminole County Sheriff); and

Dkt. No. 125-2, at p. 10, Notification of Termination. While contending that she "hired" Defendant Kenneth Cherry ("Cherry") as a compliance officer, it is undisputed that Defendant Tammy Wall ("Wall") could not hire Cherry as a Compliance Officer without Sheriff's Smith's approval and commission from his office. Cherry began as a compliance officer on July 25, 2012. Wall and Smith never agreed on who would supervise and train Cherry. Smith did not provide any training to Cherry before he was assigned to the Seminole County Drug Court as a compliance officer. Sheriff did not supervise Cherry, or give him directives of any kind while Cherry was serving as a compliance officer. Additionally, while serving as compliance officer, Cherry was not required to respond to Seminole County Sheriff's Office calls, or Wewoka Police Department calls. Cherry also was not required to attend Seminole County Sheriff's Office meetings and did not wear a Seminole County Sheriff's uniform in the performance of his duties. Furthermore, the sheriff did not provide Cherry, or any of the other drug court compliance officers, with a copy of the Seminole County Sheriff's Office's policies and procedures. Prior to being commissioned by the Sheriff, however, Cherry served approximately seven months as a volunteer reserve police officer for the City of Wewoka, Oklahoma and had worked for a little over two years as a corrections officer. The Oklahoma Council on Law Enforcement Education and Training ("CLEET") records do not contain any record of formal training while Cherry was a reserve officer for Wewoka.

Randall Scott Palmer[1] entered into a performance contract with the Seminole County Drug Court on or about May 5, 2011.  One of the requirements of this contract was attendance at all court sessions.  On September 9, 2011, a bench warrant was issued by the District Court of Seminole County due to Randall Palmer's "FAILURE TO APPEAR/NON-COMPLIANCE WITH PERFORMANCE CONTRACT."  Dkt. No. 108-4.

Prior to August 25, 2012, Cherry had been warned by individuals that Randall Palmer was dangerous and possibly armed.  On August 25, 2012, Cherry contacted the Seminole Police Department to enlist their assistance in serving the outstanding warrant at 1931 Killingsworth Avenue in Seminole, Oklahoma where Randall Palmer had been earlier in the day.[2]  Cherry met with Seminole City Police officers at a Quick Stop in Seminole to develop a tactical plan for service of the warrant.

After making a tactical plan, Seminole officers accompanied Cherry back to the Killingsworth residence.  As he approached the front door of the residence, Cherry had to go around a large pit bull chained and barking in front of the house.  Upon entering the residence, Cherry shot Aaron Palmer one time in the chest.  A Seminole Police Officer

---

[1]The various motions filed herein all refer to this person as "Randel Palmer."  The pleadings in Seminole County Drug Court refer to this person as "Randall Scott Palmer."  As a result, the Court shall use the legal name contained on the official court pleadings.

[2]Randall Palmer had lived at this address up through the year 2008. On August 25th and immediately prior thereto, however, Randall Palmer's son, Aaron Palmer, lived at this residence with his common-law wife, Nicole Attocknie, their daughter M.P. and their foster son, Damien Ruiz ("Ruiz").  Also, Randall Palmer's daughter, Tiffany Palmer, frequently came to the house on Killingsworth Avenue.  Although Randall Palmer no longer officially lived at the residence, he continued to come into the house when Attocknie was not there.  Randall Palmer had a silver car and he would park it in the field across the street from the house on Killingsworth Avenue, behind a bush or a tree.

entered the house immediately thereafter.  Cherry continued to clear the house and saw a knife in the foyer of the house.

Following the shooting, Sheriff Smith received a call about an officer-involved shooting and arrived at the scene.  Upon arrival, Sheriff observed Randall Palmer's car parked outside near the residence.  Cherry handed his weapon to Sheriff Smith, who placed the weapon in his patrol car.  The Oklahoma Bureau of Investigation ("OSBI") conducted the investigation into the shooting.

Both Aaron Palmer, Nicole Attocknie, and Ruiz were aware that Randall Palmer had a warrant outstanding for his arrest because law enforcement officers had been at the Killingsworth residence looking for Randall Palmer in May of 2012.  Additionally, Nicole Attocknie and Aaron Palmer were scared of Randall Palmer and he posed such an unpleasant and unwanted aspect of their lives that they were packing and planning on moving to an undisclosed location to get away from him.  Nicole Attocknie was aware that Aaron feared his father, Randall, because he had physically abused him and specifically had beaten him while in a car at a casino in 2011.

Following the shooting, Nicole Attocknie commented to EMT Potterfield at the hospital that "they were going to move away from all this" and that she had personally called the Seminole Drug Court and the cops to come and get "him" although she did not specify who she meant by "him."  Aaron Palmer passed away later that night at the Shawnee Medical Center.

## LEGAL ANALYSIS

Summary judgment is appropriate where there is no dispute of material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56. Defendants have the initial burden to show the absence of evidence to support Plaintiff's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). As a result, the defendants must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issues of material fact. Fed.R.Civ.P. 56(c). Plaintiff, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof." *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

When presented with a summary judgment motion, this Court must determine whether there "are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if there exists a genuine material factual issue. *Anderson*, 477 U.S. at 249-251. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*, 477 U.S. at 248. "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

5

When evaluating a motion for summary judgment, this Court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). The party opposing summary judgment, however, "may not rest upon mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## I.  Motion for Summary Judgment by Defendant Wall

On March 13, 2014, the Court entered an order dismissing this action against Defendant Wall based upon Eleventh Amendment immunity (Dkt. No. 83). Thereafter, Plaintiff filed a Second Amended Complaint (Dkt. No. 84). On April 11, 2014, Defendant Wall filed a Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. No. 94) claiming she is immune from suit under the Eleventh Amendment to the Constitution. Before this Court could rule upon said motion, Defendant Wall filed her Motion for Summary Judgment (Dkt. No. 110). After reviewing all of the pending motions, this Court asked Defendant Wall to supplement her motion for summary judgment by advising the Court what governmental entity actually issues her paycheck and what retirement system, if any, she is authorized to participate in (Dkt. No. 145). On June 27, 2014, Ms. Wall advised the Court she receives a paycheck from a bank account held by the 22nd Judicial District Drug Court - Seminole Division, Seminole County Court Special Programs. Dkt. No. 165. Ms.

Wall advised, however, that she participates in a retirement system through Seminole County and receives all benefits through Seminole County.  *Id.*

*a.  Eleventh Amendment immunity*

In her motion to dismiss the second amended complaint, Wall asserts she has Eleventh Amendment immunity.  Wall has incorporated this argument into her Motion for Summary Judgment.  While a state and its employees are entitled to Eleventh Amendment immunity from suits brought in federal court, this immunity does not apply to counties and/or their employees.  *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).  Thus, the question is whether the Seminole County Court Special Programs is an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a political subdivision to which the Eleventh Amendment does not apply.  Moreover, even if the program is an arm of the State, this Court must determine whether Wall is a state or county employee.

In considering whether an entity constitutes an "arm of the state," courts review four primary factors.  First, a formalistic survey of state law is conducted to ascertain whether the entity is identified as an agency of the state.  Second, the court must examine the degree of autonomy given to the agency.  Third, the court considers the entity's sources of financing. Finally, the court asks whether the entity is concerned primarily with local or state affairs, which will  turn upon the agency's function, composition, and purpose.  *Steadfast Ins. Co. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) and *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000).

7

Based upon the Oklahoma statutes, this Court finds felony drug courts are an instrumentality of the State of Oklahoma since counties have no authority to establish felony drug courts.  *See*, OKLA. STAT., tit. 21, § 471 and tit. 20, § 91.1.  In this case, however, considering the facts in the light most favorable to the plaintiff, it appears the State of Oklahoma contracts with Seminole County to help support the functions of some special court programs.  *See*, Dkt. No. 165-1, Affidavit of Tammy Renee O'Daniel Wall, at p. 2 ¶ 4.  According to the Second Amended Complaint, Wall has "administrative and executive (but not judicial) policymaking authority for Special Programs, which allows her to promulgate, create, implement or be responsible for the continued operation of a policy regarding the hiring, firing, supervising, and disciplining of her employees . . . ." Furthermore, the Second Amended Complaint asserts Special Programs is "an Administrative Agency **distinct** from the District Courts of Oklahoma."  Additionally, unlike normal court functions, the Seminole County Special Court's Program, according to the Second Amended Complaint, "sponsors sporting events."  Finally, according to Wall's affidavit, it appears that Wall is not a state employee.  Rather, she is a county employee as she participates in the Seminole County retirement system and receives Seminole County benefits.  Moreover, the purpose of the special drug courts appear to be diversion of individuals from the traditional court system.  Considering all of these facts in the light most favorable to the plaintiff, this Court finds Wall is not a state employee and thus, she is not entitled to Eleventh Amendment immunity.

8

### b.  Qualified immunity

The doctrine of qualified immunity protects government officials from individual liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  Once qualified immunity is raised, the plaintiff bears the burden of presenting (1) sufficient facts to establish that the defendant's conduct violated the law and (2) demonstrating that the relevant law was clearly established when the alleged violation occurred. *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997).  In assessing whether Plaintiff has asserted a violation of a constitutional right and whether the constitutional right was clearly established so that reasonable officials would have understood that their conduct violated that right, this Court must construe the Second Amended Complaint in the light most favorable to Plaintiff, accept all well-pleaded allegations as true, and draw all reasonable inferences in Plaintiff's favor.  *See*, *Bella v. Chamberlain*, 24 F.3d 1251, 1254 (10th Cir. 1994).

> In resolving questions of qualified immunity at summary judgment, courts engage in a two pronged inquiry.  The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . .show the officer's conduct violated a [federal] right[.]" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

> * * * * *
> The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation.  *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

9

> Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ibid.* "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.*, at 741, 122 S.Ct. 2508.

*Tolan v. Cotton*, — U.S. —, 134 S.Ct. 1861, 1865-1866 (2014).

Since Wall was not present at the shooting, Plaintiff's theory of liability against Wall is premised upon supervisory responsibility.  In particular, Plaintiff alleges Wall is liable under § 1983 for completely failing to train Cherry on the proper procedures for the service of an arrest warrant and/or failing to supervise Cherry during the service of the warrant. Even though Plaintiff alleges Wall was the policy maker for the Seminole County Special Court Program, there is no question under Oklahoma law that Wall could not hire Cherry to serve court process without Sheriff's Smith's approval and commission from his office. *See*, OKLA. STAT., tit. 19, §§ 514, 545,[3] 547-548.  Furthermore, regardless of who actually issued Cherry's paycheck, there is no question Cherry was commissioned and, thus, "hired" as a deputy.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court indicated "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.*, 489 U.S. at 388, 109 S.Ct. at 1204.  To the extent that Cherry was appointed as a "deputy," this Court finds Wall

---

[3]"All work issued out of the district court shall be served by the sheriff or his salaried deputies . . . . . ."

could reasonably have relied on the Sheriff's judgment that Cherry was appropriately trained on how to execute court process.  Therefore, based upon the facts of this case, this Court finds the law was not clearly established such that a reasonable person in Wall's position would have known that she needed to provide additional training to Cherry regarding service of court process.  As a result, this Court finds Wall is entitled to qualified immunity, grants her motion for summary judgment (Dkt. No. 110) and dismisses this action with prejudice against her.

## II.  Motion for Summary Judgment by Defendant Sheriff

### a.  Official capacity claims

In an attempt to avoid liability for Cherry's actions, Sheriff claims Cherry was not his employee.  Rather, according to the Sheriff he merely commissioned Cherry to work for the drug court so that Cherry could have the arrest powers he needed to perform his duties as a compliance officer for drug court.  See, Dkt. No. 108-3, at p. 2.  Moreover, Wall furthers this claim by stating she "hired" Cherry as a compliance officer.  Dkt. No. 110, at p. 5, ¶ 11.  However, both the documentation surrounding Cherry's appointment and termination as a deputy, as well as, the Oklahoma statutes establish this is a frivolous argument.  See, Okla. Stat., tit. 19, §§ 547(A), 548(A), and 545.

Sheriff claims he should not be liable in his official capacity for his failure to train and/or supervise Cherry.  Oklahoma statutes provide that the sheriff is responsible for the official acts of the undersheriff and deputy sheriffs.  OKLA. STAT., tit. 19, § 547(A).

Furthermore, "the sheriff or his salaried deputies" are required to serve all process issued by the district court.  OKLA. STAT., tit. 19, § 545.

In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038, 56 l.Ed.2d 611 (1978), the Supreme Court held a local government is liable under § 1983 for its policies that cause constitutional torts.  These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Id.*   A suit against a governmental officer "in his official capacity" is the same as a suit "against [the] entity of which [the] officer is an agent."  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2036, 56 l.Ed.2d 611 (1978).  An official capacity suit imposes liability upon the entity that the officer represents.  Accordingly, this Court must identify "those officials who have the power to make official policy on a particular issue." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).  Once these officials are identified, it becomes a question of fact for the jury to ascertain whether their decisions "caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity."  *Id.*, 491 U.S. at 737, 109 S.Ct. at 2724 (citations omitted).

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law' "; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the

12

> decisions—and the basis for them—of subordinates to whom authority was
> delegated subject to these policymakers' review and approval"; or (5) the
> "failure to adequately train or supervise employees, so long as that failure
> results from 'deliberate indifference' to the injuries that may be caused."
> *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90
> (10th Cir.2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127,
> 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *City of Canton v. Harris*, 489 U.S.
> 378, 388–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotation
> marks omitted).

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).  Moreover, in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that inadequacy of police training may serve as a basis for § 1983 liability where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*, 489 U.S. at 388, 109 S.Ct. at 1204.

As the chief law enforcement officer of the county, the Sheriff is the official policy maker of the county in all matters related to his statutory law enforcement duties, including the service of court process.  *See*, *Reid v. Hamby*, 124 F.3d 217 (10th Cir. 1997). Additionally, to the extent Oklahoma statutes place service of court process upon deputy sheriffs, it was the duty of the Sheriff to ensure that Cherry was properly trained prior to sending him out into the community to serve court process and/or that he was properly supervised while serving the same.

> In limited circumstances, a local government's decision not to train
> certain employees about their legal duty to avoid violating citizens' rights may
> rise to the level of an official government policy for purposes of § 1983.  A
> municipality's culpability for a deprivation of rights is at its most tenuous
> where a claim turns on a failure to train.  See *Oklahoma City v. Tuttle*, 471

13

U.S. 808, 822-823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Canton*, 489 U.S., at 388, 109 S.Ct. 1197.  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Id*., at 389, 109 S.Ct. 1197.

*Connick v. Thompson*, — U.S. —, 131 S.Ct. 1350, 1359-1360, 179 L.Ed.2d 417 (2011).

Based upon the undisputed facts that Sheriff provided no directives or training whatsoever to Cherry and has never supervised court compliance officers commissioned by him, this Court finds the decision not to train and/or supervise court compliance officers, is the official "policy" of Seminole County.   It is, therefore, a question of fact for the jury whether the failure to train and/or supervise a deputy who carries a lethal weapon in the course of his duties evidences "deliberate indifference" to the rights of the citizens of Seminole County.  Furthermore, it is also a question of fact for a jury whether this policy "caused" the death of Aaron Palmer.  Accordingly, Defendant Sheriff's motion for summary judgment in his official capacity is **denied**.

*b.  Individual capacity claims*

Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

14

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Title 42 U.S.C. § 1983 provides a federal remedy against any person who, acting under color of state law, deprives another of his federal rights. *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999). Two prima facie elements must be alleged in a 1983 complaint: 1) the defendant deprived the plaintiff of a right secured by the 'Constitution and laws' of the United States and 2) the defendant acted 'under color of law.' *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 399 (1970). It is undisputed that the Sheriff was not present when Cherry burst into the house on Killingsworth and shot Aaron Palmer. Attocknie alleges instead that the Sheriff is personally and individually liable for having failed to train or supervise Cherry regarding the execution of a bench warrant or the use of force and that those failures caused the Sheriff to violate Plaintiff's constitutional rights.

Sheriff claims he can not be held liable under § 1983 because he did not personally participate in the deprivations of Plaintiff's constitutional rights. To establish individual liability of a supervisor for failure to train or supervise, "a plaintiff must show that '(1) the supervisor either failed to supervise or train the subordinate official; (2) a casual link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381-82 (5th Cir. 2005). While it is true the Sheriff was not present at the scene where the shooting occurred, he did personally decide not to train and/or

15

supervise one of his deputies[4] and there clearly is a casual link between the failure to train

Cherry and the violation of plaintiff's constitutional rights.   Thus, the only question for this

Court to decide is whether the Sheriff's inaction, *i.e.* his failure to train and/or supervise one

of his deputies, evidences "deliberate indifference" to the plaintiff's constitutional rights.

> " '[D]eliberate indifference' is a stringent standard of fault, requiring proof
> that a municipal actor disregarded a known or obvious consequence of his
> action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382,
> 137 L.Ed.2d 626 (1997). Deliberate indifference can be satisfied by evidence
> showing that the defendant "knowingly created a substantial risk of
> constitutional injury." *Dodds*, 614 F.3d at 1206. "[A] local government
> policymaker is deliberately indifferent when he deliberately or consciously
> fails to act when presented with an obvious risk of constitutional harm which
> will almost inevitably result in constitutional injury of the type experienced by
> the plaintiff." *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir.1997)
> (internal quotation marks omitted).

*Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013).  Based

upon the facts alleged in Plaintiff's Second Amended Complaint, this Court finds it is a

question of fact for the jury as to whether the Sheriff was "deliberately indifferent" to the

plaintiff's constitutional right to be secure in his own house against unreasonable searches

and seizures.   Accordingly, Defendant Shannon Smith's motion for summary judgment in

his individual capacity is **denied**.

---

[4]Although Sheriff maintains he was not the "supervisor" of Cherry, Oklahoma statutes placed the responsibility for supervision upon the Sheriff.  *See*, OKLA. STAT., tit. 19, §§ 545 and 547(A).

### III.  Motion for Summary Judgment by Defendant Cherry

*a. § 1983 claims*

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 473, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).  Police are prohibited, by the Fourth Amendment, from "effectuating a warrantless and non-consensual entry into a suspect's home to make a routine felony arrest." *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994) (citing *Payton*, 445 U.S. at 576, 100 S.Ct. at 1375).  Absent exigent circumstances, even an arrest warrant does not give police the authority to enter any dwelling in search of the object of the warrant.  Rather, an arrest warrant only permits entry into the suspect's residence to effectuate an arrest.  Entry into a third party's home to effectuate the arrest of the person named on an arrest warrant requires a search warrant. *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011).

A well-recognized exception to the warrant requirement applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); see also *Payton, supra*, at 590, 100 S.Ct. 1371 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant")." *Kentucky v. King*, — U.S. —, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011).  One exigency which

17

may justify a warrantless search of a home is when police officers are in hot pursuit of a fleeing suspect. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.2d 300 (1976).

Cherry argues he should be given qualified immunity for entering Aaron Palmer's home without a search warrant. In an effort to circumvent the need for a search warrant, Cherry argues he was "in hot pursuit," citing *Stanton v. Simms*, — U.S. —, 134 S.Ct. 3, 187 L.Ed.2d 341 (2013). In *Stanton*, a police officer with probable cause to arrest a suspect for a misdemeanor kicked open a third party's front gate while in hot pursuit of the suspect. *Id.*, 134 S.Ct. at 4. The Supreme Court held the officer was entitled to qualified immunity because the law as to the warrantless entry during hot pursuit was not clearly established and the officer was not "plainly incompetent" in his interpretation of the law. *Id.*, at p. 5.

Whether or not Cherry was in "hot pursuit"[5] is a question of fact for the jury. The undisputed facts of this case indicate Randall Palmer had been at the residence earlier in the day. Cherry did not attempt to take Randall Palmer into custody at that time. Rather, he proceeded to the convenience store where he met with officers from the Seminole Police Department to develop a tactical plan. If, as Cherry claims, he had actually seen Randall Palmer run through the garage into the residence as he returned, it seems unlikely that Randall Palmer could have exited the residence without the other law enforcement officers observing him; however, this Court can not say it is impossible. Additionally, according to

---

[5]"Hot pursuit" involves an element of a chase. *Santana*, *supra*, 427 U.S. at 43, n. 3. See also, *Johnson v. United States*, 333 U.S. 10, 16 n7, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948).

Randall Palmer, he was not in the residence at the time the officers returned with the arrest warrant. The fact that the suspect's car may still have been parked outside near (but not directly in front of) the residence would not give an officer who just arrived on the scene any reason to believe that Randall Palmer was currently inside the residence let alone provide exigent circumstances, by itself, to justify a warrantless, perhaps unannounced, entry into the residence.

Cherry spends a great deal of time arguing that where an officer reasonably believes his life is in danger, he is entitled to use deadly force. While that may be true, if Cherry had no exigent circumstances to justify entry into the residence, he had already violated Aaron Palmer's Fourth Amendment rights prior to the shooting. As a result, this Court finds questions of fact exist which preclude summary judgment on Plaintiff's § 1983 claims and his motion for summary judgment is **denied**.

### b. State Constitutional Claims

Art. 2, § 30 of the Oklahoma State Constitution also protects the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches or seizures. This constitutional provision provides a private cause of action for excessive force and unreasonable seizures notwithstanding the requirements/limitations of the Oklahoma Governmental Tort Claims Act. *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013). The defense of qualified immunity does not apply to Plaintiff's state constitutional claims. *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008) (quoting

19

*Jenkins v. City of New York*, 478 F.3d 76, 86 (2nd Cir. 2007)).  Accordingly, Defendant Cherry's motion for summary judgment on the state constitutional claims is also **denied**.

*c.  State Tort Claims*

Finally, Cherry argues, as an employee of the State of Oklahoma,  he is immune from suit for state tort claims both individually and under the Eleventh Amendment.  This Court finds, however, that Cherry was not an employee of the State of Oklahoma.  Rather, Cherry was hired as a "deputy" by the Sheriff and, therefore, was an employee of Seminole County.

Pursuant to the Oklahoma Governmental Tort Claims Act "political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts,"  OKLA. STAT. tit. 51, § 152.1(A), except as provided within the Act.  *Id*., at § 152.1(B).  Political subdivisions are not liable, however, if a loss or claim results from "execution or enforcement of the lawful orders of any court."  OKLA. STAT. tit. 51, § 155(3) (2004).[6]  To the extent Cherry was attempting to execute a lawfully issued bench warrant from the Seminole County District Court, this Court finds neither Seminole County nor Cherry in his individual capacity can be held liable for the state tort claims alleged herein.  Accordingly, Defendant Cherry's motion for summary judgment on the state tort claims is **granted**.

---

[6]This particular subsection of the Oklahoma Governmental Tort Claims Act has remained the same since at least 2004. The 2009 amendments to this section of the statute, however, were ruled unconstitutional in *Douglas v. Cox Retirement Properties, Inc*., 302 P.2d 789 (Okla. 2013) and the 2012 amendment did not become effective until after the shooting involved herein.  As a result, this Court finds the 2004 statute is the appropriate state statute applicable to the claims herein.

## **CONCLUSION**

For the reasons stated herein, Defendant Tammy Wall's Motion for Summary Judgment (Dkt. No. 110) is **granted** and this action is dismissed with prejudice against Defendant Wall; Defendant Tammy Wall's Motion to Dismiss (Dkt. # 94) is **denied** as moot; Defendant Sheriff Shannon Smith's Motion for Summary Judgment (Dkt. No. 108) is **denied**; and Defendant Kenneth Cherry's Motion for Summary Judgment (Dkt. No. 107) is **denied** as to both federal and state constitutional claims and is **granted** as to all state tort claims.

It is so ordered on this  11th  day of July, 2014.

James H. Payne
United States District Judge
Eastern District of Oklahoma