# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| **NICOLE ATTOCKNIE**, | |
| Appellee-Plaintiff, | |
| vs. | Case No. 14-7054 |
| **KENNETH CHERRY** | |
| Appellant-Defendant. | |
| **SHANNON SMITH,** individually and in his official capacity as Sheriff of Seminole County, Oklahoma; and **TAMMY WALL**, individually and in her official capacity as Administrator of Seminole County Special Programs | |
| Defendants-Not Parties to Appeal. | |

## RESPONSE OF APPELLEE/PLAINTIFF

On appeal from the U.S.D.C. for the Eastern District of Oklahoma
District Court Case No. 13-158-JHP, Hon. James H. Payne, Chief Judge, presiding.

November 3, 2014

MATTINGLY & ROSELIUS, PLLC
Jack Mattingly Jr.
P.O. Box 70 | 215 E. Oak
Seminole, Oklahoma 74818-0070
[t]: (405) 382-3333 | [f]: (405) 382-6303
jackjr@mroklaw.com

ORAL ARGUMENT
NOT REQUESTED

Tanner W. Hicks
13182 N. MacArthur Blvd.
Oklahoma City, Oklahoma 73142
[t] (405) 603-2222 | [f]: (405) 603-2250
tanner@mroklaw.com
*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

I.     STATEMENT OF RELATED CASES ....................................................1

II.    MS. ATTOCKNIE'S JURISDICTIONAL STATEMENT .............................1

III.   STATEMENT OF ISSUES ON APPEAL .......................................1

IV.    STATEMENT OF THE CASE ...............................................2

   A.  Pertinent Procedural Background ......................................2

   B.  Pertinent Factual Background .........................................3

   C.  Objection to Cherry's Statement of the Facts ..........................16

V.     SUMMARY OF THE ARGUMENT ................................................17

VI.    ARGUMENT AND AUTHORITIES .............................................18

   A.  The Applicable Standards of Review ....................................18

   B.  The District Court Did Not Err In Finding Questions of Fact
       Existed as to Deputy Cherry's Alleged "Hot Pursuit" .................19

      1.  Deputy Cherry Bears the Burden of Proving Exigency .............21

      2.  Application of the "Prudent, Cautious, and Trained" Officer Standard ....23

      3.  The "Prudent, Cautious, and Trained" Officer Standard
          Demands an Examination of Objective and Ascertainable
          Sources of Information ..........................................24

   C.  The District Court Correctly Concluded that Deputy Cherry
       was not Entitled to Qualified Immunity on Summary Judgment .........27

      1.  The Law of Qualified Immunity ...................................27

      2.  Deputy Cherry Violated Aaron's Clearly Established Rights .......30

         a.  *Deputy Cherry Violated Aaron's Clearly-Established Right
             to be Free from Unlawful Entry into His Home* .................32

            (1) *Deputy Cherry's Entry Required a Search Warrant* .........33

            (2) *Deputy Cherry Cannot Show Exigent Circumstances* ........37

            (3) *Deputy Cherry's Cited Case Law Does Provide Him
                Qualified Immunity* .......................................41

i

b.    *Deputy Cherry Violated Aaron's Clearly-Established Right to be Free of Unlawful or Excessive Use of Force* ............................45

    *(1)  Deputy Cherry's Actions Objectively Unreasonable Under Clearly-Established Law* ........................................47

    *(2)  Deputy Cherry's Own Reckless and Deliberate Conduct Precipitated the Use of Deadly Force* ................................48

    *(3)  Deputy Cherry's Cited Case Law Does Provide Him Qualified Immunity* ...............................................................50

VII.   CONCLUSION ................................................................................53

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Muskogee,* 119 F.3d 837 (10th Cir.1997) ............................................. 46-47

*Armijo ex rel. v. Peterson*, 601 F.3d 1065 (10th Cir. 2010) ........................ 21-24, 37

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................30

*Baker v. McCollan*, 443 U.S. 134 (1979) ................................................30

*Becker v. Bateman*, 709 F.3d 1019 (10th Cir. 2013) ........................................ 50, 52

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ........................................................ 50-51

*Cardenas v. Fisher,* 307 F.Appx. 122 (10th Cir. 2009)...........................................18

*Casey v. City of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007) ..............................28

*Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997)........................................ 19, 29

*Corder v. Denver*, 229 F.3d 1162 (10th Cir. 2000) .......................................... 50, 52

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) ................................. 24, 45-46

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010)................................ 19, 30-31

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ...........................................28

*Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006) ............................................ 29, 32

*Gomez v. Toledo*, 446 U.S. 635 (1980)....................................................30

*Graham v. Connor*, 490 U.S. 386 (1989) ........................................30, 45-46, 50-51

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)............................................................27

*Hill v. Kansas Gas Serv. Co.*, 323 F.3d 858 (10th Cir. 2003)…………………….……20

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................31

*Koch v. City of Del City*, 660 F.3d 1228 (10th Cir. 2011).....................................27

*Kirk v. Louisiana*, 536 U.S. 635 (2002)....................................................22

*Lundstrom v. Romero*, 616 F. 3d 1108 (10th Cir. 2010) ............................ 21, 23, 37

*Mascorro v. Billings*, 656 F.3d 1198 (10th Cir. 2011) ..................................... 32, 38

*Mincey v. Arizona*, 437 U.S. 385 (1978) ........................................... 22, 38

*Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012) .......................................46

*Novitsky v. City of Aurora*, 491 F.3d 1422 (10th Cir. 2007) ..................................52

*Olsen v. Layton Hills Mall,* 312 F.3d 1304 (10th Cir. 2002)............................ 46-47

*Payton v. New York,* 445 U.S. 573 (1980) ........................................ 22, 32

*Roosevelt-Hennix v. Prickett*, 717 F.3d 751 (10th Cir. 2013) .................................18

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364 (2009) .................. 28-29

*Saucier v. Katz,* 533 U.S. 194 (2001) .......................................................46

*Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013) ..2

*Scott v. Harris*, 550 U.S. 372 (2007) .....................................................25

*Stanton v. Simms*, 571 U.S. __, 134 S.Ct. 3 (2013) ..................................... 41-44, 50

*Steagald v. United States,* 451 U.S. 204 (1981) ........................................ 32-33, 36

*Tennessee v. Garner*, 471 U.S. 1 (1985)............................................ 50-51

*Tolan v. Cotton*, 572 U.S. ___ (2014)...................................................... 19, 28, 31

*United States v. Anderson*, 981 F.2d 1560 (10th Cir. 1992)............................ 22, 38

*United States v. Flowers*, 336 F.3d 1222 (10th Cir. 2003) ....................................38

*United States v. Magallanez*, 408 F.3d 672 (10th Cir. 2005) ................................25

*United States v. Reeves,* 524 F.3d 1161 (10th Cir.2008) .......................................23

*United States v. Santana*, 427 U.S. 38 (1976) ............................................ 41, 44-45

*United States v. Shaw*, 709 F.3d 666 (6th Cir. 2013) ....................................... 35-36

*Valdez v. McPheters*, 172 F.3d 1220 (10th Cir. 1999) ...........................................33

*Wilson v. Meeks,* 52 F.3d 1547 (10th Cir.1995) ....................................................46

## Statutes

42 U.S.C. § 1983 ......................................................................................................30

21 OKLA. STAT. § 1289.25 ........................................................................................48

21 OKLA. STAT. § 733 ...............................................................................................48

22 OKLA. STAT. § 968 ...............................................................................................33

70 OKLA. STAT. § 3311 ...............................................................................................4

70 OKLA. STAT. § 3311.11 ..........................................................................................4

## Other Authorities

Karen M. Blum,

    *Qualified Immunity: A User's Manual,* 26 Ind. L. Rev. 187 (1993) ...................28

Wayne LaFave,

    *Search and Seizure: A Treatise on the Fourth Amendment* (5th ed.)...................39

## I. STATEMENT OF RELATED CASES

In accordance with 10th Cir. R. 28.2(C)(1), Plaintiff-Appellee Nicole Attocknie ("Nicole," "Attocknie" or "Ms Attocknie"), informs the Court that Shannon Smith ("Smith" or "Sheriff Smith"), a named defendant to the underlying action, has sought appeal of the same Order Denying Summary Judgment, dated July 11, 2014, ECF No. 168 (the "Appealed Order"). Sheriff Smith's appeal is styled as *Attocknie v. Smith, et al*., Case No. 14-7053.

## II. MS. ATTOCKNIE'S JURISDICTIONAL STATEMENT

On July 28, 2014, Ms. Attocknie filed a motion to dismiss Appellant-Defendant Cherry's ("Cherry" or "Deputy Cherry") appeal for lack of jurisdiction. *See Appellee-Plaintiff's Motion to Dismiss Appeal of Appellant-Defendant Kenneth Cherry* dated July 28, 2014. On August 20, 2014, Ms. Attocknie's motion was referred to the merits panel for determination. *Order* dated Aug. 20, 2014.

## III. STATEMENT OF ISSUES ON APPEAL

Deputy Cherry raises two issues on appeal[1]:

---

[1] Notably, Deputy Cherry seeks appellate review and has briefed arguments concerning only Ms. Attocknie's 42 U.S.C. § 1983 claims regarding unlawful entry and excessive force. *See generally*, *Defendant Appellant, Kenneth Cherry's Opening Brief* dated September 29, 2014 ("*Opening Brief*"). Attocknie raised both of these claims before the District Court. *See* Aplt. App. at 438-443 (unlawful entry) and Aplt. App. at 447-451 (excessive force). Ms. Attocknie has additionally raised, and continues to raise, separate §1983 claims relating to Deputy Cherry's unreasonable entry into the home and unlawful seizure. These latter two claims were fully briefed in the District Court proceedings. *See* Aplt. App. at 443-445

First, Cherry submits that the District Court erred in determining that fact questions existed as to the existence of Deputy Cherry's "hot pursuit," which Cherry claims allowed warrantless entry into the subject residence, *see Opening Brief*, 3.

Second, Cherry submits the District Court failed to address qualified immunity on excessive force alleged against Cherry. *Opening Brief*, 4.

## IV.   STATEMENT OF THE CASE

### A.     Pertinent Procedural Background

On April 10, 2013, Ms. Attocknie brought this action against Deputy Cherry and Sheriff Smith for damages sustained in the shooting death of Nicole's husband, Aaron Palmer ("Aaron"). *See generally* Aplt. App. at 29.  On May 9, 2014, Deputy Cherry moved for summary judgment, in part, on the basis of qualified immunity. *See*, Aplt. App. at 67.  In response, Ms. Attocknie argued that Cherry was not entitled to qualified immunity.  *See* VII.C.2, p. 27-52 *infra*.

On July 22, 2014, the District Court denied Cherry's request for summary judgment asserting that qualified immunity.   The District Court found that

---

(unreasonable execution of a warrant) and Aplt. App. at 445-447 (unlawful seizure). Attocknie expressly reserves these claims and both remain viable following the District Court's denial of qualified immunity.  Should this Court require review the latter two claims, Ms. Attocknie respectfully requests the ability to submit supplemental briefing.  However, as Deputy Cherry's failed to assert review of the latter two claims, Cherry should be deemed to have waived such review.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013) ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue.")

"[w]hether or not Cherry was in 'hot pursuit' is a question of fact for the jury."  Aplt. App. at 723.  As a factual dispute precluded a determination of the legitimacy of Cherry's entrance, it was unsurprising that latter occurring violations were deferred until trial:

> [I]f Cherry had no exigent circumstances to justify entry into the residence, he had already violated Aaron Palmer's Fourth Amendment rights prior to the shooting. As a result, this Court finds questions of fact exist which preclude summary judgment on Plaintiff's § 1983 claims and his motion for summary judgment is **denied**.

Aplt. App. at 724. (emphasis in original).

On July 16, 2014, Cherry filed his Notice of Appeal with the district court identifying a denial of qualified immunity as the basis for appeal.  Aplt. App. at 727.

## B.     Pertinent Factual Background

On August 25, 2012, Deputy Cherry ran into Aaron's home without knocking or announcing himself as a law enforcement officer and killed Aaron Palmer ("Aaron"), who was inside his home with his three-year-old daughter. Aplt. App. at 424, ¶ 1; Aplee. Supp. at 3, ¶ 19, Aplt. App. at 32, ¶ 19; 543, ln. 9-11; 576, ln. 23-24.  Aaron was shot in Deputy Cherry's failed attempt to serve a bench warrant on Randall Palmer ("Randall"), the ex-husband of Cherry's girlfriend and Aaron's father, for his non-compliance with a drug court performance contract.  Aplt. App. at 424, ¶ 2; Aplee. Supp. App. at 3, ¶ 22; Aplt. App. at 32, ¶ 22; 548, ln. 24 to 549, ln. 12; 557, ln. 15-18. Randall was not a resident or inside the home at the time of

the shooting.  Aplt. App. at 526, ln. 16-22; 565, ln. 24 to 566, ln. 23; 477, ln. 22-24; 426.  On the date of the shooting, Cherry knew that Aaron and Nicole lived at 1931 Killingsworth, knew Nicole couldn't stand Randall, and believed that Randall "only comes over here" when Nicole is gone from the home.  Aplt. App. at 427, ¶ 18; 565, ln. 24 to 566, ln. 23.

**Cherry's Lack of Training as a Law Enforcement Officer**

Cherry was new to law enforcement: he began working as a Compliance Officer[2] about a month before the shooting (Aplt. App. at 424, ¶ 3; Aplee. Supp. App. at 127) and he had never received formal law enforcement training at the CLEET Academy[3].  Aplt. App. at 424, ¶ 3; 547, ln. 17 to 548, ln. 19.  In fact, Cherry failed the Peace Officer Screening and Selection Exam soon after the shooting, a prerequisite to gaining admittance to the CLEET Academy.  Aplee. Supp. App. at 86; *see also* 70 OKLA. STAT. § 3311.11 (A).  Prior to the shooting, Cherry briefly

---

[2] Deputy Cherry was assigned as a Compliance Officer at the Seminole County Court Special Programs ("Special Programs"), which was administratively managed by Defendant Tammy Wall ("Wall" or "Administrator Wall").  *See* Aplt. App. at 707. At summary judgment, the District Court determined Special Programs could not claim Eleventh Amendment immunity, but was a separate, distinct, and local administrative agency.  *See* Aplt. App. at 712.

[3] Oklahoma has established the Council on Law Enforcement Education and Training ("CLEET") to ensure the professional training and continuing education of law enforcement officers in Oklahoma.  70 OKLA. STAT. § 3311(A).

served as an unpaid reserve officer and dog catcher for the city of Wewoka, Oklahoma. Aplt. App. at 425, ¶ 3; 522, ln. 3-4.

The former Wewoka Police Chief, Greg Brooks, was unable to recall what formal training Cherry received and testified that CLEET would hold a record of all of formal training Cherry received during his brief time at Wewoka. (Aplee. Supp. App. at 27; 61, ln. 14-20; 62, ln. 25 to 64, ln. 2; 65-88)  Records subpoenaed from CLEET reveal no training. (Aplee. Supp. App. at 27; 72).  There is no evidence provided that Deputy Cherry ever received any formalized law enforcement training.

**Cherry's Pre-Shooting Investigation is Sparse and Inconsistent**

Cherry's pre-shooting investigation into the whereabouts of Randall is lacking and often contradictory; for example, in an investigatory interview conducted on the night of the shooting, Cherry stated he was in the area two weeks prior trying to find Randall's silver car. Aplt. App. at 426, ¶ 12; 558, ln. 6-10.  However, in this case, Cherry's story changed.  Cherry testified that he had "absolutely not" been to the Killingsworth address looking for Randall.  Aplt. App. at 426, ¶ 12; 494, ln. 3-5; 493, ln. 15-17.

Cherry testified that Administrator Wall told him where Randall could be found.  Aplt. App. at 422; 485, ln. 12-18; *see also Opening Brief*, 7.  Administrator Wall contradicts this point: she testified she never told Deputy Cherry where Randall lived or where he could be found.  Aplt. App. at 422; 607, ln. 20-24.  Additionally,

Special Programs had received varying information regarding Randall's whereabouts, including that he was in Shawnee. Aplt. App. at 427, ¶ 17; 608, ln. 1-6. Cherry's testimony is also contradicted by Michelle Dudgeon, Cherry's girlfriend and Randall's ex-wife ("Michelle" or "Ms. Dudgeon"). Ms. Dudgeon testified Cherry would have known Aaron and Nicole lived in the house. Aplt. App. at 423; 621, ln. 9-19. Cherry, on the night of the shooting, identified Nicole as Randall's daughter-in-law and expressed that Randall's son lived at the house. Aplt. App. 565, ln. 24-25; 566, ln. 20-25; 427, ¶ 18. On the date of the shooting, children's toys were conspicuously present in the front lawn, suggesting a child lived there. Aplt. App. at 423; 457.

Additionally, Cherry did not search for Randall at any other house at any other time. Aplt. App. at 427, ¶ 19; 492, ln. 22-25. Cherry did not talk to anyone about who might be at the house, nor did Cherry knock on the door to ask who lived there. Aplt. App. at 427, ¶ 19; 485, ln. 19-22; 488, ln. 2-4. The topic of who lived at the residence was never discussed during Cherry's briefing with the Seminole police officers (Aplt. App. at 429, ¶ 32; 507, ln. 1-3; 485, ln. 23-25), and officers asked by Cherry to come by the area had not found Randall at the home. Aplt. App. at 439; 549, ln. 14-16; 565, ln. 7-9.

**The Entangled Lives of Deputy Cherry, Randall, and Ms. Dudgeon**

On the night Aaron died, Deputy Cherry was looking for his girlfriend's ex-husband, Randall. Aplt. App. at 425, ¶ 4; 557, ln. 15-17. Cherry had seen the post-abuse photographs of Ms. Dudgeon after Randall beat her around Thanksgiving of 2011. Aplt. App. 425, ¶ 4; 620, ln. 18-25. In the days before the shooting, Randall contacted Ms. Dudgeon many times, including several times after midnight. Aplt. App. at 425, ¶ 5; 628-630; 545; ln. 24-25; 560, ln. 15-16; 631. Randall and Ms. Dudgeon divorced in 2010, but continued to see each other romantically. Aplt. App. at 425, ¶ 6; 613, ln. 3-10; 619, ln. 12-19. Randall testified that he and Dudgeon were involved as recently as three weeks before the shooting. Aplt. App. at 425, ¶ 6; 470, ln. 8-20. On the night of the shooting, Deputy Cherry stated that Ms. Dudgeon provided him with a number that Randall had been using to call her and told Cherry that law enforcement had "never gotten him or don't do anything." Aplt. App. at 425, ¶ 7; 561, ln. 5-7; 590, ln. 5-7.

**Nicole and Aaron Wanted Randall Out of Their Lives**

Nicole and Aaron were in the process of moving to get away from the dysfunction associated with Randall. Aplt. App. at 427, ¶ 16; 644, p. 54, ln. 3-18. Aaron feared his father, in part, because Randall had physically abused him and had previously beaten him while in a car at a casino in 2011. Aplt. App. at 709; 66, ¶ 25. Randall had a history of violence with Ms. Dudgeon, and was physical with

Aaron's foster child. Aplt. App. 425, ¶ 4; 421; 620, ln. 18-23. Randall testified that Aaron had "washed his hands of him," elaborating that he "and Aaron, really, we didn't talk too much, because I did my thing, he did his thing, and that's what put that barrier in there between us. He wanted better of me. I know I should have been doing better…and I fell off the horse and got back on drugs, and that didn't sit well with him." Aplt. App. 427, ¶ 16; 478, ln. 6-13. On the night of the shooting, Deputy Cherry told investigators that Ms. Attockne couldn't stand Randall. Aplt. App. at 427 at ¶ 18; 565, ln. 24 to 566, ln. 3; ln. 20-24; 621, ln. 9-19.

Nicole and Aaron assisted, and did not frustrate, the police. Two or three months before the shooting, police came by the house looking for Randall. Aplt. App. at 426, ¶ 15; 646, p. 170, ln. 16-25. Nicole let the police in, and Aaron consented to the police searching the house. Aplt. App. at 426, ¶ 15; 646, p. 170, ln. 16-25; 645, p. 55, ln. 22 to p. 56, ln.1. The home was searched and the police left. Aplt. App. at 426, ¶ 15; 646, p. 170, ln. 16-25. Ms. Dudgeon testified that Nicole asked her several months before the shooting to call and report where her father-in-law was staying, which was at a house near Seminole High School. Aplt. App. at 426, ¶ 15; 614, ln. 21 to 615, ln. 7. Michelle did, but the Special Programs did not seem to care, and nothing came of it. Aplt. App. at 426, ¶ 15; 614, ln. 22 to 616, ln. 23.

**Cherry's First Purported Sighting of Randall**

After spending much of August 25, 2012 in Oklahoma City, where he visited the C.O.P.S. store, Cherry returned to Seminole, Oklahoma. Aplt. App. at 425, ¶ 8-9; 500, ln. 20 to 501, ln. 8. Upon arrival, Cherry proceeded down Lewis Street, one block north of Killingsworth, where he spotted a silver car in a field, began backing up, and purportedly saw an individual in the garage of 1931 Killingsworth. Aplt. App. at 428, ¶ 22; 502, ln. 10 to 503, ln. 3. Cherry could not see what the individual was doing or his approximate age. Aplt. App. at 428, ¶ 23; 503, ln. 16-18; 505, ln. 2 to 506, ln. 1. A block away and viewing "through the houses," Cherry contends this individual, described as wearing shorts and a ball cap, was Randall. Aplt. App. at 428, ¶ 23; 503, ln. 12-14; 505, ln. 7-13. Randall testified he was not in the garage but was laying on his stomach near the silver car and claims he saw the police cruiser pull in and back out from his vantage point on the ground. Aplt. App. at 428, ¶ 24; 698, ln. 3 to 699, ln. 5. The above-mentioned field is not part of the 1931 Killingsworth property.

**Cherry Leaves the Area**

Cherry called the dispatch office for the Seminole Police Department and asked that officers meet at a nearby convenience store to assist him in serving a warrant. Aplt. App. at 428, ¶ 28; 656; 449, ln. 3-5; 506, ln. 6-11. The bench warrant did not list an address or manner of service. Aplt. App. at 199; 439. Part of the plan,

and Cherry's "feeling of the situation at the time" was that Seminole Police officers would be in position behind the house, and Cherry and other officers would enter through the front of the house, thereby covering all entrances to the house and prevent Randall from "running out of that house and escaping." Aplt. App. at 429, ¶ 30; 497, ln. 5-23; 508, ln. 16 to 509, ln. 23. During the briefing, it was never discussed who lived at 1931 Killingsworth. Aplt. App. at 429, ¶ 32; 507, ln. 1-3; 485, ln. 2-9. Before arriving at the house, Cherry made a preemptive decision to "enter the premises to find [Randall], because he had been seen there." Aplt. App. at 428, ¶ 29; 486, ln. 21-22.

**Deputy Cherry Kills Aaron and Randall Is Not in the Home**

According to Cherry, as he arrived at 1931 Killingsworth, he "saw somebody running through the garage," who "from the back" looked like the same individual. Aplt. App. at 429, ¶ 35; 574, ln. 23-25. Randall has testified that during this time he was in the field to the west of the silver car, not in the garage. Aplt. App. at 429, ¶ 35; 477, ln. 17-24. Deputy Cherry ran—gun drawn—from his police cruiser to the front door of Aaron and Nicole's residence. Aplt. App. at 430, ¶ 37-38; 515, ln. 4-22. Without hesitation, Cherry forced open the door of the home and fired almost instantaneously at Aaron, shooting him in the chest. Aplt. App. at 430, ¶ 40; 431, ¶ 43-45; 488, ln. 24 to 489, ln. 1.; 490, ln. 3-6; 576, ln. 17-23; 670. Aaron died at a nearby hospital later that night. Aplt. App. at 432, ¶ 55; 670. Before pushing open

the door, Deputy Cherry was unable to see Aaron inside the home.  Aplt. App. at 431, ¶ 43; 514, ln. 1-9.

After shooting Aaron, Deputy Cherry cleared the house, and as he entered the kitchen—just a few feet away—Cherry saw Aaron's three-year-old daughter "staring" at him.  Aplt. App. at 432, ¶ 50; 576, ln. 23-24.

A paramedic responded to the call for assistance, entered the home through the garage and found Aaron laying facedown in handcuffs.  Aplt. App. at 432, ¶ 52; 661, ln. 13; 662, ln. 1-5; 663, ln. 16-18.  Aaron later told the paramedic that he had urinated on himself, and believed he was going to die.  Aplt. App. at 432, ¶ 53; 665, ln. 21 to 666, ln. 4.  Aaron told Officer Hill, "Tell my daughter I love her."  Aplt. App. at 432, ¶ 51; 463, ln. 14-15.  Aaron also told the paramedic that he was glad his daughter was not shot because she was also in the house.  Aplt. App. at 432, ¶ 54; 668, ln. 20 to 669, ln. 3.

Despite combing the area, Randall was not found at the house or in the surrounding areas that night.  Aplt. App. at 433, ¶ 56; 541, ln. 9-13.  Randall was arrested the next day in a neighboring town.   Aplt. App. at 433, ¶ 57; 672. Regrettably, Deputy Cherry now suffers from memory problems, which first began when Cherry "came out of the house."  Aplt. App. at 433, ¶ 60; 498, ln. 9-13.

**Witness Accounts of Deputy Cherry's Conduct**

Two witnesses were present at the scene—Kent Dawson, a neighbor, and David Hill, a fellow officer. Neither heard Cherry knock or announce himself as a law enforcement officer. Aplt. App. at 430, ¶ 31; 422; 533, ln. 13-25; 465, ln. 1-3.

Kent Dawson was Aaron and Nicole's landlord and neighbor. Aplt. App. at 429, ¶ 34; 525, ln. 4-10; 535, ln. 1-21. He was standing in his yard, just east of Aaron's house, when he heard car engines moving "rapidly" down the street and turned to see them stop in front of Aaron and Nicole' house. Aplt. App. at 429, ¶ 34; 527, 9-12; 528, ln. 2-5. Dawson initially saw four officers exit their cruisers and move toward the house, with the first officer running toward the front door, the second officer moving down the driveway toward the garage, and the last two officers spreading across the yard headed to the back door. Aplt. App. at 430, ¶ 37; 529, ln. 15 to 530, ln. 9. Dawson saw Deputy Cherry, the first officer, pull up in his car, run toward the house, disappear out of view behind the garage, and then heard a gunshot. Aplt. App. at 430, ¶ 37, 41; 432, ¶ 49; 529, ln. 15 to 530, ln. 3; 531, ln. 6-13. Dawson never heard Deputy Cherry knock or announce himself as a law enforcement officer. Aplt. App. at 422; 430, ¶ 41; 533, ln. 15-25.

Officer David Hill followed Deputy Cherry to the house. Aplt. App. at 429, ¶ 36; 462, ln. 3-6. Officer Hill heard no knock or announcement, but did hear an unintelligible male shout just before the gunshot. Aplt. App. at 429, ¶ 36; 422; 462,

ln. 20 to 463, ln. 2; 464, ln. 11-25.  Officer Hill estimates that he arrived in the home

about 5 seconds after Cherry shot Aaron. Aplt. App. at 430, ¶ 36; 466, ln. 4-19.

Consistent with Officer Hill's testimony, Cherry testified when he opened the door,

Aaron yelled and then Cherry shot him.  Aplt. App. at 430, ¶ 42; 518, ln. 10 to 519,

ln. 19.

Inexplicably, although both witnesses saw Deputy Cherry run fast across the

yard, Cherry estimates it took him at least a minute to run to the front door.  Aplt.

App. at 430, ¶ 39; 520, ln. 12 to 521, ln. 2.

**Cherry's Account of the Shooting and Crime Scene Evidence**

On the night of the shooting, Cherry told an investigator that Aaron's hands

were raised at the time he shot him.  Aplt. App. at 431, ¶ 44; 581, ln. 13-16.  When

asked if Aaron was moving, Deputy Cherry said that Aaron "was just right in front

of me.  He was just in front of me."  Aplt. App. at 431, ¶ 44; 581, ln. 13-16; 581, ln.

10-13.  When asked if Cherry remembers what he was aiming at, he responds, "No,

sir.  I just—center mass.  Just what was in front of me.  I just saw him.  Just saw

him."  The timing was just "very instantaneous."  Aplt. App. at 431, ¶ 45; 580, ln.

4-8; 517, ln. 8-10.

A knife, a partially eaten cheeseburger, and a pair of children's flip flops, all

sprayed with blood, were found nearest to where he was shot.  Aplt. App. at 431, ¶

46; 455-456; 463, ln. 6-10.  A pile of shoes was also in the corner of the entry

13

hallway, consistent with Aaron about to deposit his three-year-old daughter's sandals to the moving pile. Aplt. App. at 431, ¶ 46; 455. A paramedic asked Aaron en route to the hospital what happened, to which Aaron responded that he was "eating a hamburger and – or fixing to eat a hamburger and he walked out and got shot by the cop." Aplt. App. at 432, ¶ 54; 667, ln. 1-10.

Cherry told investigators on the night of the shooting that he saw Aaron "holding up something in his hand", which after the fact he knew to be a knife, but Cherry couldn't even express in which hand Aaron was holding the unidentified object. Aplt. App. at 431, ¶ 47; 580, ln. 23-25; 512, ln. 18-22. Cherry "didn't see the knife" until he finished clearing the house. Aplt. App. at 432, ¶ 47; 580, ln. 15-16. In fact, Cherry could not recite where Aaron's hands were even though he "saw what [he] thought was a weapon of some kind," because as stated by Cherry, "I was already—I already was on him, you know. I mean, it just happened that—that quick. I didn't have—I didn't have time to think. I just—I reacted." Aplt. App. at 432, ¶ 48; 581, ln. 17-24. Deputy Cherry added, "I couldn't tell you if it was a gun or not. I just saw shine, just shine. I didn't know what to do." Aplt. App. at 449; 585, ln. 8-10.

### Deputy Cherry was Plainly Incompetent on the Night He Killed Aaron

Cherry testified that he never thought about knocking on the door, because he believed the warrant for Randall was of a type that waived the Fourth Amendment.

14

Aplt. App. at 433, ¶ 58; 495, ln. 10-23.  Additionally, Cherry did not pause at the door, because "[he] felt very confident in what [he] was doing when [he] went into the door after the individual."  Aplt. App. at 433, ¶ 59; 510, ln. 23 to 511, ln. 13. Deputy Cherry has admitted he does not have a working knowledge of warrants or officers' obligations to knock and announce before entering private dwellings.  Aplt. App. at 433, ¶ 58, ¶ 62; 496, ln. 17-22.

Cherry received no formal or informal training from the Sheriff Smith, meaning that Cherry received no training on making arrests of citizens, allowable use of force, entering private dwellings, searches and seizures, serving or executing warrants, or hot pursuit.  Aplt. App. at 433-434, ¶ 63; 675, ln. 25 to 676, ln. 2. Moreover, Cherry never qualified with the firearm used to kill Aaron. Aplt. App. at 434, ¶ 64; 483, ln. 21-22.  Cherry's only training with the weapon was shooting "a lot of rounds" at his brother's place in the country.  Aplt. App. at 434, ¶ 64; 484, ln. 6-11.

On the night he killed Aaron, Deputy Cherry confided that he was underprepared: "Just -- but -- I'm just nervous because I ain't even been through CLEET yet.  You know what I mean?" Aplt. App. at 434, ¶ 65; 585, ln. 10-12. During his deposition, Cherry was questioned on when it was permissible to enter a private dwelling with a warrant,  Cherry responded: "Other warrants, sir, I'm not super familiar with that.  I hadn't learned that paperwork yet, all of it, from CLEET.

Just from the practical training that I went through, that type of thing." Aplt. App. at 434, ¶ 66; 496, ln. 6-12.

### C. Objection to Cherry's Statement of the Facts

Ms. Attocknie hotly contests many of Deputy Cherry's facts and inferences that may be drawn from those facts. Most of Ms. Attocknie's objections have thus been incorporated into IV.B., p. 3-16, *supra*. However, Ms. Attocknie addresses the following two points separately:

First, Cherry cites an unrelated drug court participant's statement that a contractual waiver of the Fourth Amendment is "effective to any residence" a participant is in, whether it is hers or not. *See Opening Brief*, 7-8. Reference to the actual provision may assist the Court:

> "As a condition of participation in this program, I agree to the search of *my* person, property, place of residence, vehicle or personal effects at any time with or without a warrant, and with or without reasonable cause, when required by a probation officer or other law enforcement officer."[4]

Aplt. App. at 423; 626, ¶ 34. Randall did not waive someone else's Fourth Amendment rights. Furthermore, Administrator Wall explained to Deputy Cherry that any Fourth Amendment waiver contained in Randall's drug performance contract did not apply to people that did not sign a waiver, such as Aaron or his home. Aplt. App. at 610, ln. 18 – 611, ln 16.

---

[4] Emphasis added unless otherwise indicated.

Second, Deputy Cherry again cites a letter from the District Attorney of a neighboring judicial district declining to criminally prosecute Deputy Cherry. *See Opening Brief*, 9. Before the District Court, Ms. Attocknie objected to consideration of the letter on the bases of relevance and hearsay. *See* Aplt. App. at 424. The District Attorney's opinion that a statutory exception to murder, which was enacted specifically to protect law enforcement officers serving process, shielded Cherry from criminal charges is not telling of Deputy Cherry's civil liability.

## V.  SUMMARY OF THE ARGUMENT

Deputy Cherry is not entitled to qualified immunity for the shooting death of Aaron. The District Court correctly identified that a factual dispute exists whether exigency was present at the time Deputy Cherry burst through the door of Aaron's home and shot him in the chest. While Cherry contends, under his set of facts, that "he was in hot pursuit of a convicted felon when he entered the subject residence and shot Aaron in self-defense" (*Opening Brief*, 9), the record on summary judgment, which must be construed in favor of Ms. Attocknie, removes any claim of exigency. Thus Deputy Cherry's attack on appeal is ultimately one of factual sufficiency.

Before the District Court, and again here, before this Court, Ms. Attocknie has defeated qualified immunity by providing facts by which a reasonable jury could conclude that Cherry violated Aaron's constitutional Fourth Amendment rights, and

that Cherry had notice of such rights as they were clearly established on the date of the shooting. On August 25, 2012, plain application of clearly-established law showed the Fourth Amendment protected a resident, who was within his home, from a law enforcement officer bursting through the front door unannounced and shooting that resident in the chest. As a result, this Court should affirm the Order of the District Court and remand for further proceedings, as material facts in dispute preclude summary judgment.

## VI.  ARGUMENT AND AUTHORITIES

### A.  The Applicable Standards of Review

A denial of qualified immunity does not automatically vest this Court with appellate jurisdiction; in fact, only a subset of those denials trigger this Court's interlocutory review. "Whether a ruling falls within, or outside, that subset depends on the extent to which the appeal turns on an abstract issue of law." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013). This Court has stated it should "scrupulously avoid second-guessing the district court's determinations regarding whether plaintiffs have presented evidence sufficient to survive summary judgment." *Cardenas v. Fisher*, 307 F. App'x 122, 124-25 (10th Cir. 2009) (unpublished). Thus, "[a]n order denying qualified immunity on summary judgment is not appealable if it merely determines the facts asserted by the plaintiff are

sufficiently supported by evidence in the record to survive summary judgment."

*Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997).

If found to be within the subset conferring jurisdiction, this Court reviews a district court's denial of summary judgment asserting qualified immunity *de novo*. *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010). However, due to the procedural posture of this matter, this Court must continue to construe all factual inferences in favor of Ms. Attocknie, the non-movant. *Tolan v. Cotton*, 572 U.S. ___ (2014).

## B. The District Court Did Not Err In Finding Questions of Fact Existed as to Deputy Cherry's Alleged "Hot Pursuit"

For the first time on appeal,[5] Deputy Cherry seeks qualified immunity on the basis that exigent circumstances were present and justified his entry into a third

---

[5] Deputy Cherry's deputy-only determination of exigency is a new creation. No reference could be found to this argument in either Cherry's Motion for Summary Judgment or Reply in Support of Summary Judgment. While the Deputy briefly raised the principle of hot pursuit in Motion for Summary Judgment (*see* Aplt. App. at 64, ¶ 7-8; 68), and later argued in his reply brief that he acted thoughtfully in "attempting to take [Randall] into custody while in hot pursuit," (Aplt. App. at 679) Deputy Cherry failed to assert any standard for assessing exigency or the sources of information relevant to such an inquiry. Cherry now seeks to uses this new theory to support a request for this Court to review factual matters decided by the District Court.

Giving Deputy Cherry all benefit of the doubt, Cherry, in discussing excessive force, which in logic and under the facts of this case, arose after Cherry's unlawful entry of the home, to which he asserts exigency as a cure, noted that any mistake made by Cherry in use of excessive force is justified "if unknown to the officer in hot pursuit." Aplt. App. at 679. However, Cherry's instant argument on appeal is not even one of mistake, rather, Cherry's argument is one of the permissible scope

party's residence *solely* on the basis of Cherry's *post hoc* articulations of his conduct.[6]  *See Opening Brief*, 9-10.  However, the District Court determined that questions of fact justified submitting the question of exigency to the trier of fact. Aplt. App. at 723.

Deputy Cherry seeks to narrow the universe of factual inferences, which must be construed in favor of Ms. Attocknie, and asks this Court for *de novo* review of the District Court's factual findings on the notion that the District Court committed "legal error en route to a factual determination."[7]  *Opening Brief*, 2.  Upon a clean slate, Cherry asks this Court to agree that his testimony is only permissible source

---

of evidence to which Cherry argues his articulation of events is the only source that may be considered in assessing exigency.

This Court should not consider this argument as this Court has "repeatedly held that absent 'extraordinary circumstances,' we do not consider arguments raised for the first time on appeal. *Hill v. Kansas Gas Serv. Co.*, 323 F.3d 858, 866 (10th Cir. 2003).

[6] *See Opening Brief* 9-10; *see also Opening Brief* 15 ("To arrive at the 'fact question' scenario, promulgated by the District Court and pursued by the Appellee, the Court would have to determine that an individual officer's articulated reason for hot pursuit and home entry can never stand alone.").

[7] Seeking any exception to divest the District Court of its factual findings, Deputy Cherry additionally states that any question of fact as to "hot pursuit" "is blatantly contradicted by the record." *Opening Brief*, 3.  However, it is apparent that any such blatant contradiction requires this Court to ignore the facts submitted by Ms. Attocknie to the District Court.

to measure the presence of exigency,[8] despite the District Court's factual findings based on other objective information.

In summary, Deputy Cherry seeks to allow law enforcement officers to be both judge and jury of their own liability and make the subject of the pursuit optional in the claimed exigency of "hot pursuit" of a fleeing felon.[9] For these reasons, and as stated in greater detail below, the District Court did not err in finding that exigency should be submitted to the trier of fact.

1.  Deputy Cherry Bears the Burden of Proving Exigency

Under this Court's jurisprudence, Deputy Cherry—not Ms. Attocknie—bears the burden of establishing the exigent circumstances. *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010). This Court has stated "[t]hat burden is especially heavy when the exception must justify the warrantless entry of a home." *Lundstrom v. Romero,* 616 F.3d 1108, 1128 (10th Cir.2010). It is well-established that, "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement

---

[88] *See Opening Brief*, 9 ("[T]he existence of 'exigent circumstances'…is based upon the objective facts as reasonably articulated by Cherry, and are not dependent upon the actual presence of Randall Palmer at the time of pursuit.")

[9] *See Opening Brief*, 10. (The "fact question of the actual presence of [Randall] Palmer at the time of the initiated pursuit is misplaced.")

*so compelling* that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393–94 (1978).

It is deeply rooted in constitutional jurisprudence that "the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Id.* at 393. Thus, as an exception to the warrant requirement, exigent circumstances "must be jealously and carefully drawn." *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992).

While Deputy Cherry's cites prominently to case law interpreting probable cause, [10] exigent circumstances is the purported basis for Deputy Cherry's request for qualified immunity.[11] Therefore, while omitted, the appropriate standard is that this Court weighs the presence of exigency by "evaluate[ing] the circumstances as they would have appeared to prudent, cautious, and trained officers." *Armijo*, 601

---

[10] *See e.g.,* "The Supreme Court has never recognized a limitation of interlocutory jurisdiction from an order denying qualified immunity, where the issues involved whether or not probable cause or reasonable suspicion exist. *Opening Brief*, 11; "…[T]he issue of whether probable cause or reasonable suspicion is present is always reviewed *de novo*." *Opening Brief,* 12.

[11] Probable cause and exigent circumstances are distinct and separate inquiries. *See Kirk v. Louisiana,* 536 U.S. 635, 638 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home. The Court of Appeal's ruling to the contrary, and consequent failure to assess whether exigent circumstances were present in this case, violated *Payton*.").

F.3d at 1071 (quoting *U.S. v. Reeves,* 524 F.3d 1161, 1169). This standard is not met by relying only on an officer's *post hoc* justification for his actions.

2. <u>Application of the "Prudent, Cautious, and Trained" Officer Standard</u>

This Court's "prudent, cautious, and trained" standard is an objective, not subjective standard. *Armijo*, 601 F.3d at 1071 (quoting *U.S. v. Reeves,* 524 F.3d 1161, 1169). Limiting evidence to an officer's *post hoc* articulation has already been rejected by this Court.

In *Lundstrom v. Romero*, 616 F.3d 1108 (10th Cir. 2010), an officer acted under a claim of exigent circumstances. When evidence was presented negating the presence of exigency, the officer claimed she was not personally aware of such information at the time. *Id.* at 1117. Instead of limiting the facts to those as articulated by the officer, this Court allowed a showing of the mitigating information and found—despite the officer's testimony to the contrary—that exigency did not exist. *Id.* at 1124 ("Taking into account all of the circumstances and the information the officers had, including the exculpatory information discussed above, exigent circumstances did not support Lundstrom's seizure.") Thus, while there may be some limitation, an officer's post-incident recitation falls short of being the exclusive repository from which the "prudent, cautious, and trained" officer standard may be measured.

3. The "Prudent, Cautious, and Trained" Officer Standard Demands an Examination of Objective and Ascertainable Sources of Information

A claim of exigent circumstances requires "some factual support." *Armijo*, 601 F.3d at 1072. Otherwise, the exception to the warrant requirement swallows the rule. *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007). It is implicit to the "show facts" requirement that such facts be subject to mechanisms for proving the truth or falsity. The limitation suggested by Deputy Cherry raises serious and fundamental questions of justice, as it would preclude an injured party from presenting relevant extrinsic evidence for either substantive or impeachment purposes. It strains basic fairness for an injured party to be forced to prosecute her case inside the confines of an adverse party's recollection of events, particularly here, when a party has admitted memory issues (Aplt. App. at 433, ¶ 60; 498, ln. 9-13), and his account is in stark contradiction to other witnesses' accounts.[12] The potential for gamesmanship in Deputy Cherry's requested standard is so obvious and repugnant to fair play and substantial justice that it should be summarily dismissed.

Deputy Cherry's proposed standard allows a defendant to articulate facts, as a litigation tactic, to establish exigency despite other readily-available evidence,

---

[12] As referenced in IV.B, pg. 19-26, *supra*, neither Officer Hill nor Mr. Dawson heard Deputy Cherry knock or identify himself before entering Aaron and Nicole's home. Cherry claims he did announce. Aplt. App. at 490, ln. 5-8.

such as contradictory witnesses or video footage. The Supreme Court has rejected such exclusion, finding video footage helpful, even dispositive, in § 1983 cases. [13] *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). Thus, law enforcement officers may not act as judge and jury of their own liability and an officer's recitation of events in the police report should not be dispositive. While exigency may be found in the absence of mathematical certainty, conflicting evidence and accompanying inferences of an officer's narrative, can and should be considered in assessing an officer's actions under the "prudent, cautious, and trained" officer standard.

Finally, Deputy Cherry's request is problematic under the facts of this case. While Deputy Cherry dedicates much ink to issues of witness credibility, it is for the trier of fact to determine the credibility of witnesses. *See United States v. Magallanez*, 408 F.3d 672, 682 (10th Cir. 2005) ("It is not the role of an appellate

---

[13] Indeed, officer-mounted video footage might conclusively resolve whether exigency ever existed. Unfortunately, the Seminole County Sheriff's Department and the Seminole County Court Special Programs, like many departments in Oklahoma, do not provide such equipment to its deputies. Such mounted video would protect both officers and the public. Certainly the objective nature of video provides probative value to courts. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) ("There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question….The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals…. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.")

court to consider the credibility of the witnesses or weigh the conflicting evidence, as these matters are within the exclusive province of the jury.")  Deputy Cherry's argument ignores other explicit findings made by the District Court in support of the conclusion that the presence of exigency was properly reserved for the trier of fact. Such findings include:

One, the District Court's consideration of the impact of Cherry's decision not to take Randall into custody upon first "seeing" him.  Aplt. App. at 723.  Two, the District Court's finding of the improbability, but not impossibility, that Randall could have exited the residence without drawing the attention of law enforcement. Aplt App. at 723.  Three, the finding that the presence of an automobile not parked within the boundaries of the property provided little support for Randall's presence within the home.  Aplt. App. at 724.  Each of these findings, in addition to other evidence before the District Court, support a finding that the trier of fact could appropriately conclude no exigency existed.

Therefore, this Court may affirm the District Court's determination that exigency is properly submitted to the trier of fact.  This Court has sensibly held, and common sense and the facts of this case support, that a trier of fact is not required to take an officer's articulated reason at face value, but instead, may subject that determination to ordinary probing of the truth or falsity, particularly if the facts transpired in front of a fellow police officer and neighbor, as in this case.

**C.    The District Court Correctly Concluded that Deputy Cherry was not Entitled to Qualified Immunity on Summary Judgment**

Deputy Cherry appeals an order denying Cherry's motion for summary judgment asserting qualified immunity.  For reasons stated below, the District Court properly denied qualified immunity.

### 1.    The Law of Qualified Immunity

Qualified immunity requires an inquiry into the objective reasonableness of the official's actions. *Harlow v. Fitzgerald,* 457 U.S. 800, 816 (1982).  At summary judgment, a defendant's assertion of qualified immunity does not absolve the defendant of his traditional burdens, as the moving party, but only delays them.  Once Plaintiff has shown that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established, a defendant, as the moving party, then "bear[s] the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact that he or she is entitled to judgment as a matter of law." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011).  The District Court previously determined a genuine dispute of material facts precluded summary judgment.  *See* Aplt. App. at 719-721.

Recently, the United States Supreme Court reaffirmed "the importance of drawing inferences in favor of the nonmovant," even if a court decides only the clearly-established prong of the standard: "In cases alleging unreasonable searches or seizures, we have instructed that courts should define the 'clearly established'

right at issue on the basis of the 'specific context of the case.' *Tolan v. Cotton*, 572 U.S. ___ (2014). "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id*.

The inherent difficulty of qualified immunity is often that "whether the right was clearly established will be a function of how narrowly the 'contours' of the particular right are drawn when framing the inquiry." Karen M. Blum, *Qualified Immunity: A User's Manual,* 26 Ind. L. Rev. 187, 200 (1993). While "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains," *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008), this Court has recognized that the "difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). In assessing the state of the law, a balance must be struck, because "there will <u>almost never</u> be a previously published opinion involving exactly the same circumstances," and a court "cannot find qualified immunity wherever [there is] a new fact pattern." *Casey*, 509 F.3d at 1284.

For this reason, there is no need that "the very actions in question [have] previously been held unlawful." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557

U.S. 364, 377-78 (2009).  Recognizing the unfairness of too exacting an application, this Court has added:

> We would be placing an impracticable burden on plaintiffs if we required them to cite a factually identical case before determining they showed the law was 'clearly established' and cleared the qualified immunity hurdle. Thus, ... we adopt the approach of requiring some but not precise factual correspondence in demanding that officials apply general, well-developed legal principles.... While qualified immunity was meant to protect officials performing discretionary duties, it [ ] should not present an insurmountable obstacle to plaintiffs seeking to vindicate their constitutional rights.

*Clanton v. Cooper*, 129 F.3d 1147, 1157 (10th Cir. 1997).

Given these concerns, it is unsurprising that the this Court has characterized the clearly established element as a shift "from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional. Thus, government officials must make reasonable applications of the prevailing law to their own circumstances, and they can still be on notice that their conduct violates established law even in novel factual circumstances." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (internal citations and quotations removed).

Applying these standards to the instant appeal, Deputy Cherry is not entitled to qualified immunity.

## 2. Deputy Cherry Violated Aaron's Clearly Established Rights

The factors necessary to establish a liability under 42 U.S.C. § 1983 will vary with the constitutional provision at issue, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), because § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes. *Baker v. McCollan*, 443 U.S. 134, 144, n.3 (1979); *see also Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

Section 1983 requires a showing of two elements: "First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (internal citation omitted). Deputy Cherry admits he acted under color of state law (Aplt. App. at 433, ¶ 61; 54, ¶ 18; 31, ¶ 18), therefore Ms. Attocknie need only show, with all inferences drawn in her favor, that Deputy Cherry deprived Aaron of a federal right. If such rights are clearly established, Ms. Attocknie additionally defeats qualified immunity.[14]

---

[14] *See Dodds v. Richardson*, 614 F.3d 1185, 1193-94 (10th Cir. 2010) ("Because a plaintiff can neither recover under § 1983 from a government official nor overcome the official's assertion of qualified immunity without demonstrating that official violated his constitutional or statutory rights, the legal analysis required to surmount these separate obstacles is often related, if not identical. As Justice Thomas explained:

The "'clearly established' prong of the qualified immunity inquiry asks whether the '[t]he contours of the right' the plaintiff claims the defendant violated are 'sufficiently clear,'" not that the means of violation be clearly established. *Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010). Thus, Ms. Attocknie need only establish that Aaron's right to be free from unreasonable searches and seizures under the Fourth Amendment was clearly established considering the "specific context of the case." *See Tolan v. Cotton*, 572 U.S. ___ (2014). Given the procedural posture of this case, this Court "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 572 U.S. at ___.

Construing all factual inferences in favor of Ms. Attocknie, as this Court must do, establishes the following context: Aaron was in his home. An armed Deputy Cherry pushes open the door without a search warrant and without knocking or announcing himself as a law enforcement officer. Cherry gives no command, and instead, shoots Aaron in the chest with a .45 pistol while Aaron stood in the foyer of

---

In conducting qualified immunity analysis ..., courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct.

*Hope v. Pelzer,* 536 U.S. 730, 751 n. 9 (2002) (Thomas, J., dissenting)."

his home.   A cheeseburger, a knife, and a pair of children's flip flops were found nearest to where Aaron was shot.   Aaron reported to a paramedic, while dying, that he was eating a cheeseburger when he was shot by a cop.[15]

Therefore, Ms. Attocknie must show that on August 25, 2012, the state of the law put Deputy Cherry on "fair notice that the described conduct was unconstitutional," *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006), i.e. that it was unconstitutional for an him to enter the home of a third party—without a search warrant, without knocking or announcing, in the absence of exigent circumstances— and shoot the resident of that home in the chest.

As discussed in detail below, Deputy Cherry violated clearly-established rights, and therefore, Cherry is not entitled to qualified immunity.

a.    *Deputy Cherry Violated Aaron's Clearly-Established Right to be Free from Unlawful Entry into His Home*

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  However, "[e]ven an arrest warrant does not give police carte blanche to enter any dwelling in search of the object of the warrant; while such a warrant permits entry into the suspect's residence to effectuate an arrest, entry into a third party's home for the same purpose requires a search warrant.

---

[15] *See* IV.B, p. 3-16, *supra*.

*Mascorro v. Billings*, 656 F.3d 1198, 1204-05 (10th Cir. 2011) (citing *Steagald v. United States*, 451 U.S. 204, 222 (1981)). It is well established that "[a] person's expectation of privacy in her residence 'is plainly one that society is prepared to recognize as justifiable. At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Valdez v. McPheters*, 172 F.3d 1220, 1224 (10th Cir. 1999) (internal citations omitted)

### *(1)     Deputy Cherry's Entry Required a Search Warrant*

While an arrest warrant implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within, absent exigent circumstances, an arrest warrant by itself does not authorize entry into the home of a third party. *Id.* Here, the warrant at issue is a bench warrant, which under Oklahoma law is served in the same manner as an arrest warrant. 22 OKLA. STAT. § 968. Applying *Steagald*, this Court has determined a law enforcement officer may enter the home of a third party only when there is a reasonable basis for believing that the subject of the arrest warrant "both (1) lived in the residence and (2) could be found within at the time of entry." *Valdez*, 172 F.3d at 1225. This belief must be objectively reasonable at the time of entry, thus not inquiring into the subjective belief of the officer. *Id.* The first prong requires that the structure be the "suspect's dwelling," while the second prong allows for

consideration of "common sense factors indicating a resident's presence." *Id.* at 1226. Drawing all inferences in favor of Ms. Attocknie, Deputy Cherry violated Aaron's clearly-established right to be free from unlawful entry into his home by an officer holding an arrest warrant for a non-resident.

An objective inquiry demonstrates that Deputy Cherry had no objectively reasonable basis for believing Randall resided at 1931 Killingsworth. He did not. On the night of the shooting, Cherry knew that Aaron and Ms. Attocknie lived at 1931 Killingsworth, knew Attocknie couldn't stand Randall, and believed that Randall "only comes over here" when Attocknie is gone from the home. Aplt. App. at 427, ¶ 18; 565, ln. 24 to 566, ln. 23. Further, the bench warrant at issue did not list 1931 Killingsworth as the address for service, (Aplt. App. at 199; 439) and any reliance on Deputy Cherry's testimony that Special Programs employees, like Administrator Wall, told Cherry that Randall resided at 1931 Killingsworth is subject to close scrutiny. Aplt. App. at 485, ln. 12-18. Under oath, Administrator Wall testified she never told Cherry where Randall lived or where he could be found. Aplt. App. at 422; 607, ln. 20-24.

Additionally, Deputy Cherry's pre-entry investigation does not support an objectively reasonable basis for concluding Randall resided at 1931 Killingsworth. For example, (1) Randall was not found two weeks earlier when Cherry was in the neighborhood looking for Randall's car, Aplt. App. at 426, ¶ 12; 494, ln. 3-5; 493,

ln. 15-17; 558, ln. 6-10; (2) Officers asked by Cherry to come by the area had not found Randall, Aplt. App. at 422; 549, ln. 14-16; 565, ln. 7-9; (3) Cherry's girlfriend had called Special Programs alerting them to Randall's whereabouts at another house, Aplt. App. at 422; 426, ¶ 15; 616, ln. 24 to 617, ln. 7; (4) the topic of who lived at the residence was never discussed during Cherry's briefing with the Seminole police officers, Aplt. App. at 429, ¶ 32; 507, ln. 1-3; 485, ln. 23-25; (5) Cherry had not searched for Randall at any other house at any other time, Aplt. App. at 427, ¶ 19; 492, ln. 22-25; 485, ln. 19-22; 488, ln. 2-4; 538, 10-25; (6) Cherry never asked Aaron's landlord and next door neighbor who lived at the residence, Aplt. App. at 427, ¶ 19; 492, ln. 22-25; 485, ln. 19-22; 488, ln. 2-4; 538, 10-25; (7) Cherry knew Nicole and Aaron lived at the residence; in fact, Cherry knew Nicole worked with his mother, but Cherry never asked Nicole who lived at the house. Aplt. App. at 422-423; 565, ln. 20 to 566, ln. 7; 566, ln. 20-24; 621, ln. 9-19; 439.

Finally, any reliance on the presence of a car, which was not parked at Aaron's house, but was located in a vacant field across the street and central to several residences, is insufficient.  On this point, the Sixth Circuit's recent decision in *United States v. Shaw*, 707 F.3d 666 (6th Cir. 2013) is instructive.  There, officers had an arrest warrant that listed the address of the individual sought by law enforcement and officers were able to narrow their inquiry to one of two addresses. *Id*. at 667.  Instead of taking common sense steps to investigate whether the officers

had the right address, for example, by asking a resident of the house, officers picked one door and announced affirmatively that they had an arrest warrant "for this house." *Id*. The Court declared that this "fifty-fifty likelihood" of being wrong when readily available alternatives were available violated the Fourth Amendment. *Id*. The Shaw Court held that the Fourth Amendment prohibits unreasonable searches and seizures, which means, among treatises full of other requirements, that officers must "take steps to reasonably ensure" they are not entering the wrong home when they execute an arrest warrant. *Shaw*, 707 F.3d at 667-68.

This Court must jealously guard the dwelling requirement or risk rending to a virtual nullity the Supreme Court's holding in *Steagald v. United States* that, absent exigent circumstances, an arrest warrant does not permit entry into the dwelling of a third party. See *Steagald*, 451 U.S. at 222 (1981).

Secondly, there was no objectively reasonable basis to believe Randall was present at the time of entry. He was not. Cherry's first purported sighting occurred when Cherry was a city block away from 1931 Killingsworth. Aplt. App. at 428, ¶ 22; 502, ln. 10 to 503, ln. 10. At the time, Cherry could not see what the individual was doing or his approximate age. Aplt. App. at 428, ¶ 23; 503, ln. 16-18; 505, ln. 2 to 506, ln. 1. Viewing "through the houses," Cherry contends this individual, described as wearing shorts and a ball cap, was Randall. Aplt. App. at 428, ¶ 23; 503, ln. 12-14; 505, ln. 7-13. No other witness substantiates Cherry's claims. When

Cherry returns, he claims he "saw somebody running through the garage," who "from the back" looked like the same individual. Aplt. App. at 429, ¶ 35; 574, ln. 23 to 575, ln. 1. No other person saw an individual running through the garage.[16] Kent Dawson, a witness to the events, claims he never saw Randall that evening. Aplt. App. at 441; 534, ln. 18-22. Despite the Deputy's claims, Randall was not found at the home that evening. Aplt. App. at 433, ¶ 56; 541, ln. 9-13.

Because there was no objectively reasonable basis for believing that Randall resided at 1931 Killingsworth and was present within the home at the time of the events, Cherry's no-address bench warrant was insufficient for entry into Aaron's home. Thus, in the absence of exigent circumstances, a search warrant was constitutionally required for entry into Aaron's home.

*(2)* *Deputy Cherry Cannot Show Exigent Circumstances*

Under this Court's jurisprudence, Deputy Cherry—not Ms. Attocknie—bears the burden of establishing the existence of an exigency. *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010). This Court has held "[t]hat burden is especially heavy when the exception must justify the warrantless entry of a home." *Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir.2010).

---

[16] Additionally, the subject of the bench warrant has testified he was not in the garage, as claimed by Deputy Cherry. *See* Aplt. App. at 428, ¶ 24; 429, ¶ 35; 474, ln. 3-25; 476, ln. 1- 5; 477, ln. 17-24.

As stated by the Supreme Court, "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement *so compelling* that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978). Foundational is the truth that "the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Id*. at 393.

Here, there were no exigent circumstances. But in any event, the police are not free to create exigencies to justify warrantless intrusions. *United States v. Flowers*, 336 F.3d 1222, 1230 (10th Cir. 2003). "As an exception to the warrant requirement, exigent circumstances "must be jealously and carefully drawn," and because such exception "invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated." *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992) (internal citations omitted). The existence of exigent circumstances is a mixed question of law and fact, *id.*, and the burden is on the party seeking to demonstrate exigent circumstances. *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011).

Deputy Cherry has not met his burden of establishing exigent circumstances. In fact, the inferences of fact, construed in favor of Ms. Attocknie, foreclose hot pursuit for two reasons:

First, there was no suspect of which Cherry was "hot pursuit." Randall was not in the house. Cherry did not pursue a suspect or criminal. This genuine dispute of fact alone should end the Courts inquiry on hot pursuit.

Second, Cherry's planned arrest[17] of Randall also precludes "hot pursuit" as Deputy Cherry's conduct precipitated any perceived exigency:

> A "planned" arrest is one made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place, either the arrestee's home or some other premises where he is believed to be, in order to take him into custody. Courts have understandably been reluctant to accept police claims of exigent circumstances in these situations, for it ordinarily appears that whatever exigencies thereafter arose were foreseeable at the time the arrest decision was made, when a warrant could have readily been obtained. In the "planned" arrest situation, then, the only exception to any existing warrant requirement would be the presence of exigent circumstances prior to the time the officers went out into the filed for the purpose of making the arrest.

LaFave, *Search and Seizure* §6.1(f) (5th ed.). Here, exigency could not exist, because it ripened, if ever, at the time Cherry claims he first "saw" Randall. At the time Cherry first "saw" Randall, Cherry was confident that Randall had not seen

---

[17] Before arriving at the house, Cherry made a preemptive decision to "enter the premises to find [Randall], because he had been seen there." Aplt. App. at 428, ¶ 29; 486, ln. 21-22.

him, thus there was no flight. Aplt. App. at 428 at ¶ 26; 504, ln. 21-22. Thus, it is clear that Cherry created any exigency he now seeks to claim.[18]

Upon "seeing" Randall, Cherry had a number of options, including: (1) having "seen" Randall at the house, pursue a search warrant; (2) stay at the scene and wait for Randall to leave and then arrest him; (3) ask for permission to look in the house, as prior officers did, *See* Aplt. App. at 426, ¶ 15; 646, p. 170, ln. 16-25; or (4) call for backup at the scene to surround the house and command Randall to come out. Any of these options would have appropriate and prudent.

Cherry chose not to remain at the scene of the "exigency;" instead, Cherry, called dispatch, left the scene, and conducted a briefing with officers of the Seminole Police Department. Aplt. App. at 428 at ¶ 28; 656; 499, ln. 3-5; 506, ln. 17-20. In fact, Cherry had already considered the potential of flight and orchestrated a plan to minimize the chance. Aplt. App. at 429 at ¶ 30; 497, ln. 19-23; 508, ln. 13-22; 509, ln. 20-23. Cherry's own actions and testimony foreclose any re-genesis of exigency.

---

[18] Additionally, there is legitimate concern that exigency is used *post hoc* to conceal Deputy Cherry's own incompetence at the time of the events. *See e.g.*, During his deposition, Cherry was questioned on when it was permissible to enter a private dwelling with a warrant, Cherry responded: "Other warrants, sir, I'm not super familiar with that. I hadn't learned that paperwork yet, all of it, from CLEET. Just from the practical training that I went through, that type of thing." Aplt. App. at 434, ¶ 66; 496, ln. 6-12; *see also* Aplt. App. at 495, ln. 10-23: Cherry believed the warrant at issue was of a type that waived the Fourth Amendment.

Here, construing all inferences in favor of Ms. Attocknie, Deputy Cherry is not entitled to qualified immunity. Clearly-established law prevents an officer from using an arrest warrant to enter a home if a resident is not named in the warrant. Additionally, because there was no exigency, Deputy Cherry was required to obtain a search warrant to enter Aaron's home.[19] For these reasons, and in light of case law extant years before the shooting, Aaron's clearly established constitutional right was violated.

### (3) Deputy Cherry's Cited Case Law Does Provide Him Qualified Immunity

Deputy Cherry's cites two cases in support of qualified immunity for his entry into Aaron and Nicole's home: *Stanton v. Sims*, 571 U.S. __, 134 S.Ct. 3 (2013) and *United States v. Santana*, 427 U.S. 38 (1976). *Opening Brief*, 13-14. However, neither case merits granting Deputy Cherry qualified immunity for violation of Aaron's clearly-established rights.

Deputy Cherry characterizes *Stanton* as a "remarkably similar" case, *Opening Brief*, 13; however, any factual similarities are surface level and the sole issue that was before the Supreme Court is not before this Court.

In *Stanton*, the officer was investigating reports of an "unknown disturbance" involving a person with a baseball bat in area associated with gang violence. *Id.*

---

[19] In any event, the District Court determined that questions of fact made the presence of exigency a question for the trier of fact. Aplt. App. at 723-724.

Upon noticing a suspect in the street, the officer yelled "police" and ordered the suspect to stop "in a voice loud enough for all in the area to hear." *Id.* at 4. The suspect did not obey commands, but rather "looked directly at [the officer], ignored his lawful orders, and quickly went through the front gate" of a fence enclosing a resident's yard. *Id.* Believing the suspect committed a crime, the officer took chase after the suspect. *Id.* While in active pursuit, the officer kicked open the gate to the front yard, which struck and injured a resident. *Id.* The resident suffered a cut forehead and injured her shoulder. *Id.*

The Ninth Circuit determined that the officer's warrantless entry into the resident's yard was unconstitutional because the resident was entitled to the same expectation of privacy in her curtilage as in her home itself, because there was no immediate danger, and because the suspect had committed only the minor offense of disobeying a police officer. *Id.* The Ninth Court also found the law was clearly established that the exigent circumstances could not apply given the suspect "was suspected of only a *misdemeanor*."

The Supreme Court granted certiorari, allowed to stand the Ninth Circuit's determination that the officer acted unconstitutionally, but reversed the Ninth Circuit's second holding, finding that the applicable law did not clearly establish that hot pursuit was limited to the commission of felonies. *Id.*, at 4, 6. (While the Supreme Court has stated "application of the exigent-circumstances exception in the

context of a home entry should rarely be sanctioned," the Supreme Court "did not lay down a *categorical rule* for all cases involving *minor offenses*" but simply stated that "a warrant is 'usually' required."). The Court expressly made no judgment on whether the conduct was constitutional. *Id.* at 7.

*Stanton* is not an opinion stating an officer acted appropriately. Rather, the *Stanton* is an opinion chastising the Ninth Circuit for seeking to limit the doctrine of hot pursuit to the commission of felonies where such limitation was not clearly established in law. Thus, simply put, the *Stanton* opinion is inapposite as the issue before the Supreme Court in *Stanton* is not before this Court. For previously stated reasons, *supra*, misdemeanor-induced hot pursuit, is not properly at issue in this case. Thus, *Stanton* is inapposite on the law. *Stanton* does not provide a safe haven for any officer who calls it by name, and the *Stanton* opinion does not require qualified immunity be bestowed upon Deputy Cherry.

Additionally, *Stanton* is distinguishable on the facts. Indeed, the only meaningful factual similarity between the two is that each plaintiff was injured during a set of events whereby an officer the hastily pushed open a gate or door. First, unlike this case, the officer in *Stanton* loudly identified himself as an officer and ordered the suspect to stop. Second, unlike this case, there was no dispute that the officer was in actual pursuit of a suspect. Third, unlike this case, the injured plaintiff in *Stanton* was not within her home—a place of most stringent

constitutional protections. Fourth, unlike this case, the officer did not use deadly force.

Thus, the Supreme Court's statement that exigency may—in theory—be invoked during the commission of a misdemeanor does not establish the Deputy's entitlement to qualified immunity as *Stanton* is distinguishable, and Cherry has failed to meet his burden of invoking exigency or, alternatively, because exigent circumstances is rightfully a question for the trier of fact.

Cherry's citation to *United States v. Santana*, 427 U.S. 38 (1976) is equally unavailing. In *Santana*, the Supreme Court determined that a lawful arrest, which began to be effected while the defendant was located within the doorway of her home, may not be defeated by the suspect's withdrawal into her home. 427 U.S. at 43. The *Santana* decision illustrates "hot pursuit" may form the basis for exigency, but provides no support for invoking the principle in the instant matter. In fact, an examination of the facts confirms the opposite. In *Santana*, there was no question as to the identity of the subject, the commission of the crime, the residence of the suspect, or the presence of the suspect at the time of hot pursuit. *Id.* at 40. There, multiple officers identified the individual standing in the door way and witnessed the withdrawal into the vestibule of the home. *Id.* ("Pruitt and the *others* then drove approximately two blocks back to 2311 North Fifth Street. They *saw* Santana standing in the doorway of the house.")

Here, despite the presence of a number of law enforcement officers, only Deputy Cherry claims to have seen Randall on the night of the shooting. Unlike *Santana*, where an undercover investigation confirmed the identity of the suspect, *id.* at 38, Cherry's identification occurred from a block away, which prevented him from even ascertaining the individual's age. Aplt. App. at 428, ¶ 23; 503, ln. 12-14; 505, ln. 8 to 506, ln. 4. Taken together, *Santana* is a verified pursuit, while much of the instant matter is subject to factual dispute. Therefore, *Santana* does not support qualified immunity when the very presence of an exigency is hotly contested.

   b.  *Deputy Cherry Violated Aaron's Clearly-Established Right to be Free of Unlawful or Excessive Use of Force*

  The District Court did not err in denying Cherry's motion for summary judgment asserting qualified immunity on Ms. Attocknie's excessive force claim.[20]

  A claim of excessive force is governed by the "reasonableness standard" of the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395 (1989). In *Graham,* the Supreme Court set forth the test for determining whether an officer's use of force was constitutionally excessive by examining "whether the officer's actions [were] objectively reasonable in light of the facts and circumstances confronting them,

---

[20] This Court has decided that inquiries into unlawful seizure and excessive force "are separate and independent, though the evidence may overlap." *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007). As Deputy Cherry has failed to raise Ms. Attocknie's unlawful seizure claim in this appeal, *see* III, p. 1-2, *supra*, Cherry has waived appellate consideration of that claim.

without regard to their underlying intent or motivation." *Id.* at 397 (quotations omitted). This reasonableness standard is clearly established for the purposes of Section 1983, *Wilson v. Meeks,* 52 F.3d 1547, 1552 (10th Cir.1995), *abrogated on other grounds by, Saucier v. Katz,* 533 U.S. 194 (2001), and requires a court to weigh several factors including the severity of the crime, the degree of threat the subject poses to the safety of the officer and the public, and the subject's cooperation or resistance. *Graham,* 490 U.S. at 396–97; *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1314 (10th Cir. 2002).

Because the existence of excessive force is "a fact-specific inquiry, ...there will almost never be a previously published opinion involving exactly the same circumstances. Thus, [this Court has] adopted a sliding scale: The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).

"The excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). Thus, "[t]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own *reckless or deliberate* conduct during

the seizure unreasonably created the need to use such force." *Id*. This Court "will thus consider an officer's conduct prior to the suspect's threat of force if the conduct is "immediately connected" to the suspect's threat of force." *Id.*

*(1)    Deputy Cherry's Actions Objectively Unreasonable Under Clearly-Established Law*

Thus, the inquiry is whether the force applied by Cherry to seize Aaron was "objectively reasonable in light of the facts and circumstances confronting [him]," *Olsen,* 312 F.3d at 1314, while considering whether Cherry's "own reckless or deliberate conduct" created the need to use such force. *Allen*, 119 F.3d 840.

The facts show that Cherry's use of deadly force was objectively unreasonable. There was no suspect for Cherry to chase after. The warrant did not identify 1931 Killingsworth as the address for service. Aplt. App. at 342; 439. Cherry did not wait but excitedly ran into the house. Aplt. App. at 429, ¶ 36; 430, ¶ 37, ¶ 40; 432, ¶ 49; 510, ln. 6-22. Cherry did not knock or announce himself, thereby creating a myriad of surprises for the home's innocent occupant when the Deputy entered the house with his weapon out.

 Cherry provided no commands to Aaron, instead he shot. Aplt. App. at 450; 533, ln. 15-18; 539, ln. 8-20. On the night of the shooting, Cherry was asked directly if Aaron was moving toward him. Cherry responded, "He was just right in front of me. He was just in front of me." Aplt. App. at 431, ¶ 44; 450; 576, ln. 10-13. In the course of this lawsuit, Cherry's story changed: Aaron was now "coming at [him]

in an aggressive deal." Aplt. App. at 450; 513, ln. 18-20. While Aaron was five feet

away from Cherry when shot, (Aplt. App. at 431, ¶ 43; 576, ln. 17-23) Aaron was

trapped in a narrow entry hallway, while Cherry was near the threshold of the door.

Aaron had no time to manifest any intentions toward Cherry, and the presence of a

cheeseburger, a knife, and his daughter's pink flip flops dispel any malicious intent.[21]

Notably, Cherry shot so quickly that he could not even recall Aaron's arm placement

on the night of the shooting. Aplt. App. at 432, ¶ 48; 581, ln. 17-24. Aaron's

unintelligible shout just before he was shot was likely one surprise to an armed

intruder bursting through the door where his young daughter was present. Aplt. App.

at 430, ¶ 36; 464, ln. 11-16.

> (2)    *Deputy Cherry's Own Reckless and Deliberate*
> *Conduct Precipitated the Use of Deadly Force*

It is clear that Cherry's own reckless and deliberate conduct created the need

to use deadly force. Aaron was lawfully within his own home when confronted by

the barrel of a gun connected to an unannounced intruder. In fact, Cherry's gun was

raised before he even hit the door of the house. Aplt. App. at 430, ¶ 38; 515, ln. 4-

---

[21] However, *assuming arguendo* that Aaron did have the kitchen knife later found
on the floor in his hand, Oklahoma law allows an individual the right protect
himself and his three-year-old daughter. *See* 21 OKLA. STAT. § 733; *see also* 21
OKLA. STAT. § 1289.25 (raising a presumption of reasonable fear of imminent peril
of death for the occupant of a dwelling and creating a corresponding presumption
that one who unlawfully and by force enters a dwelling of another person is
presumed to be doing so with the intent to commit an unlawful act involving force
or violence).

22.  Even if Aaron raised a knife in self-defense (or seized up in shock), it was the presence of an armed Cherry that precipitated the action.  If Cherry had simply knocked and announced, Aaron would have been allowed the opportunity to see who was at the door and answer it or obey a command.  Aaron and Nicole had previously cooperated with police when they came to the door in search of Randall.  Aplt. App. at 426, ¶ 15; 646, p. 170, ln. 16-25.  Instead, Cherry impermissibly created a crisis, and then wrongfully shot his way out of it.

Any allowance of qualified immunity on these facts would have dire implications for the citizens of Oklahoma.  On the night of the shooting, Cherry admits: "I couldn't tell you if it was a gun or not.  I just saw shine, just shine.  I didn't know what to do."  Aplt. App. at 449; 585, ln. 7-9.  If an officer can simply intrude into a private home and shoot when he sees "shine," a multitude of Oklahomans are at risk of being gunned down in their homes, including sportsmen, those relying on self-defense statutes, home chefs, and those that happen to be holding a kitchen knife while eating a cheeseburger.  Aaron did not walk out into the front yard brandishing a weapon; Aaron was shot in the entry hallway near his kitchen while eating a cheeseburger.  Aplt. App. at 431, ¶ 46; 432, ¶ 54; 667, ln. 1-10.

Construing the context in favor of Ms. Attocknie, Aaron's right to be free from excessive force was clearly established in the context of this case.  Upon conducting this Court's inquiry, Deputy Cherry's use of force was objectively

unreasonable in light of clearly-established law.[22]  For the reasons discussed above, and in light of case law extant years before the shooting, Aaron's clearly-established-constitutional right was violated.

### (3) Deputy Cherry's Cited Case Law Does Provide Him Qualified Immunity

Deputy Cherry's cites a number of cases in his discussion of qualified immunity for his use of deadly force in seizing Aaron inside his home:  *Brosseau v. Haugen*, 543 U.S. 194 (2004), *Tennessee v. Garner*, 471 U.S. 1 (1985), *Graham v. Conner*, 490 U.S. 386 (1989) and *Becker v. Bateman*, 709 F.3d 1019 (10th Cir. 2013), and *Corder v. Denver*, 229 F.3d 1162 (10th Cir. 2000) (unreported).  *Opening Brief*, 21-22.  However, these cases do not merit granting Deputy Cherry qualified immunity for his violation of Aaron's clearly-established rights.

In *Brousseau v. Haugen*, an officer shot a fleeing suspect after a protracted struggle to gain custody of the suspect.  *Id.* at 196-97.  The *Brousseau* Court specifically noted the presence of civilians and other officers in the immediate path of the suspects escape.  *Id.* at 196.  Following an initial chase on foot, the suspect gained control of a Jeep, which despite the officer's best efforts to gain control over the situation with non-deadly force, resulted in the suspect recklessly fleeing the

---

[22] In any event, the District Court determined that questions of fact preclude further analysis of excessive force.  *See* Aplt. App. at 724.

scene. *Id.* Exhausting other options, the officer shot at the Jeep, which was hurdling into the path of other individuals. *Id.* at 197.

First, unlike here, the suspect was engaged in a crime at the time he was shot. *Id.* Second, the suspect admitted "he drove his Jeep in a manner indicating "a wanton or willful disregard for the lives of others." *Id.* Third, unlike Aaron, the suspect was involved in a physical fight that precipitated the call to law enforcement. *Id.* at 195. Thus, the suspect was not "merely attempting to flee," *Opening Brief* at 21, but was physically engaged with citizens and officers and refused to submit, even to the pointed pistol of the officer. *Id.* at 196. While finding qualified immunity, the suspect had exhibited violent behavior, refused to submit to a showing of lethal force, and admitted to fleeing in in willful disregard for the lives of others. Here, Deputy Cherry pushed open Aaron's front door and shot him. Aplt. App. at 430, ¶ 40; 431, ¶ 43; 575, ln. 24-25; 576, ln. 17-19. *Brousseau* is distinguishable.

Deputy Cherry cites *Tennessee v. Garner* and *Graham v. Conner* for the well-established standard that excessive force cases are judged by the objective reasonableness standard of the Fourth Amendment.[23] *Opening Brief*, 22. Cherry

---

[23] The *Tennessee* Court ruled that a statute allowing the use of deadly force to prevent the escape of one accused of committing a felony was constitutionally unreasonable. 471 U.S. at 25. The *Graham* Court made explicit *Tennessee*'s implicit analysis that all claims that law enforcement used excessive force in the arrest, investigatory stop, or other "seizure" is measured under the Fourth Amendment's reasonableness standard. 490 U.S. at 395.

claims this standard justifies his conduct, as he believed Aaron posed a threat. *Opening Brief*, 22. However, for the reasons discussed in VI.C.2.b.1-2, p. 45-50, *supra*, these cases do not support qualified immunity for Cherry.

Finally, Deputy Cherry cites to *Becker v. Bateman* and *Corder v. Denver*. In *Becker*, an officer threw a potentially intoxicated individual to the ground after the suspect resisted arrest. *Id.* at 1021. As a result, the individual suffered a severe brain injury. *Id.* Declining to consider whether the officer acted unconstitutionally, the *Becker* Court focused on whether the individual's rights were clearly established. *Id.* at 1022. Discussing *Novitsky v. City of Aurora*, 491 F.3d 1422 (10th Cir. 2007), the Court determined that appropriate level of force employed by an officer in arresting a potentially intoxicated driver was not clearly established in 2005 when the complained of events occurred, specifically noting that intoxicated drivers present unique risks and inquiries into the use of force are "inherently fact-dependent." *Becker*, 709 F.3d at 1023. In *Becker*, the plaintiff simply failed to carry his burden. *Id.* Deputy Cherry's citation to *Corder v. Denver* is unusual as this Court actually affirmed a denial of qualified immunity asserted at summary judgment. As neither case applies to the context of this case, the Deputy's citation of either does not grant him qualified immunity.

Thus, none of the cases cited by Deputy Cherry require this Court to grant him qualified immunity for Aaron's death.

## VII. CONCLUSION

For the foregoing reasons, Ms. Attocknie respectfully requests this Court uphold the Appealed Order and remand the case to the District Court for further proceedings.

Respectfully submitted,

MATTINGLY & ROSELIUS, PLLC

*s/ Jack Mattingly Jr,*
Jack Mattingly Jr.
P.O. Box 70 | 215 E. Oak
Seminole, Oklahoma 74818-0070
[t]: (405) 382-3333 | [f]: (405) 382-6303
jackjr@mroklaw.com

Tanner W. Hicks
13182 N. MacArthur Blvd.
Oklahoma City, Oklahoma 73142
[t]: (405) 603-2222 | [f] (405) 603-2250
jackjr@mroklaw.com

*Attorneys for Appellee Nicole Attocknie*

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Bitdefender, Ver. 7.57538, updated Nov. 3, 2014, and according to the program are free of viruses.

Date: November 3, 2014

_s/ Tanner W. Hicks_
Tanner W. Hicks
Mattingly & Roselius, PLLC
13182 N. MacArthur Blvd.
Oklahoma City, Oklahoma 73142
[t]: (405) 603-2222 | [f] (405) 603-2250
tanner@mroklaw.com

_Attorney for Appellee Nicole Attocknie_

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,707 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman, size 14 point font.

Date: November 3, 2014        *s/ Tanner W. Hicks*
                      Tanner W. Hicks
                      MATTINGLY & ROSELIUS, PLLC
                      13182 N. MacArthur Blvd.
                      Oklahoma City, Oklahoma 73142
                      [t]: (405) 603-2222 | [f] (405) 603-2250
                      tanner@mroklaw.com

                      *Attorney for Appellee Nicole Attocknie*

## CERTIFICATE OF SERVICE

    I hereby certify that on November 3, 2014  I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Phil Anderson | Jack Mattingly Sr. |
| panderson@czwlaw.com | jacksr@mroklaw.com |
| | |
| Jordan L. Miller | Jason E. Roselius |
| Jordan@czwglaw.com | jason@mroklaw.com |
| | |
| Chris Collins | Richard Mann |
| cjc@czwglaw.com | Richard.mann@oag.ok.gov |
| | |
| | M. Daniel Weitman |
| | dan.weitman@oag.ok.gov |

    Additionally, I hereby certify that on November 3, 2014 I mailed seven copies of the foregoing, in addition to Appellee's Supplemental Index to the Clerk of Court and served the foregoing and Supplemental Appendix by first class mail, postage

pre-paid to the following interested parties, who may not be a registered participant of the Court's CM/ECF system:

Lawrence R. Murphy, Jr.
RICHARDS & CONNER
Park Centre Building, 12th Floor
525 South Main Street
Tulsa, Oklahoma 74103-4509
Telephone: (918) 585-2394
lmurphy@richardsconnor.com

Richard N. Mann
M. Daniel Weitman
Dixie L. Coffey
Wilson D. McGarry
OKLA. ATTORNEY GENERAL'S OFFICE
313 NE 21st Street
Oklahoma City, Oklahoma 73105

Philip W. Anderson
Chris J. Collins
Jordan L. Miller
COLLINS ZORN & WAGNER, P.C.
429 NE 50th St., Second Floor
Oklahoma City, Oklahoma 73105

Date: November 3, 2014

*s/ Tanner W. Hicks*
Tanner W. Hicks
MATTINGLY & ROSELIUS, PLLC
13182 N. MacArthur Blvd.
Oklahoma City, Oklahoma 73142
[t]: (405) 603-2222 | [f] (405) 603-2250
tanner@mroklaw.com

*Attorney for Appellee Nicole Attocknie*